**Haskell Levi CHAPOOSE, et al., Plaintiffs,**

v.

**William P. CLARK, et al., Defendants.**

**Civ. No. C–83–1145W.**

United States District Court, D. Utah, C.D.

April 10, 1985.

George E. Mangan, Machelle Fitzgerald, Roosevelt, Utah, for plaintiffs.

Joseph W. Anderson, Asst. U.S. Atty., William R. McConkie, Dept. of the Interior, Salt Lake City, Utah, Martin E. Seneca, Jr., Fort Duchesne, Utah, for defendants.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

The issues in this case have been reduced by two previous memorandum decisions and orders. Only one issue remains. Both parties agreed that the final issue should be decided on memoranda without oral argument, with the plaintiffs submitting the first memorandum, the defendants then submitting their memorandum, and the plaintiffs submitting a reply. All memoranda have now been received. Throughout the case, plaintiffs have been represented by George E. Mangan, Machelle Fitzgerald, and Herbert Wm. Gillespie. Defendants have been represented by Joseph W. Anderson and William Robert McConkie. The court has read the memoranda submitted by the parties, and has reviewed the administrative record, various of the authorities cited, and all the material contained in the court file. Being now fully advised, the court renders the following decision.

### Background

This case began when the Secretary of Interior denied applications from each of the plaintiffs that they be added to the rolls of the Ute Indian Tribe. The Secretary held that 25 U.S.C. § 677d precludes the plaintiffs from becoming tribe members. According to the Secretary, only Indians who are "full-bloods" can be members of the tribe. Also according to the Secretary, "full-bloods" are only those who "possess [ ] one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half." 25 U.S.C. § 677a(b). None of the plaintiffs meet this blood-quantum requirement.

The Secretary's action came after the highest level of the Ute Tribal Court had found that the plaintiffs are entitled to tribal membership under the tribal constitution. The tribal court had ordered the Ute Tribal Business Committee to seek the Secretary's approval of an ordinance enrolling the plaintiffs in the tribe. Because the plaintiffs do not meet the blood-quantum requirement the Secretary believes to be mandated by § 677a(b), the Secretary refused to approve the Ute Tribal Business Committee ordinance which would have enrolled them in the tribe. The Secretary's action means that the plaintiffs are not considered to be members of the tribe and are not awarded any share of the tribal trust funds.

■ This court previously dismissed the second through fifth causes of action contained in the plaintiffs' complaint. Only one basic issue remains: whether the Secretary's action in denying the plaintiffs membership in the tribe is arbitrary, capricious, or contrary to law. *See* 5 U.S.C. § 706(2)(A). Because the Secretary's action turns on his interpretation of a statute he is charged to administer, his action can be overturned only if his interpretation is "clearly wrong" or "plainly erroneous." *R.V. McGinnis Theatres & Pay T.V., Inc. v. Video Independent Theatres*, 386 F.2d 592, 594 (10th Cir.1967), *cert. den.*, 390 U.S. 1014, 88 S.Ct. 1265, 20 L.Ed.2d 163 (1968); *Board of Directors and Officers, Forbes Federal Credit Union v. National Credit Union Admin.*, 477 F.2d 777, 783–84 (10th Cir.1973), *cert. den.*, 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158. As discussed below, this court finds that the Secretary's interpretation of § 677d is clearly and plainly contrary to Congress's intent. Consequently, the Secretary's action cannot stand.

### The Language of the 1954 Act

This case revolves around the proper interpretation of the tribal enrollment provisions of the Act of Aug. 27, 1954, Pub.L. No. 670, 68 Stat. 868 (codified as amended at 25 U.S.C. §§ 677–677aa) [hereinafter cit-

ed as "the 1954 Act"]. The 1954 Act divided the Ute Tribe on the Uintah-Ouray Reservation into two groups, the mixed-bloods and the full-bloods, and terminated only one of those groups, the mixed-bloods. The mixed-bloods were given their share of the tribal assets and their tribal identity was terminated. This termination was effective on August 24, 1961, when the Secretary of the Interior issued a proclamation removing restrictions on mixed-blood property and terminating federal recognition of the mixed-bloods as an Indian tribe. The full-bloods, however, were not terminated as a tribe. Congress intended that the full-bloods continue their tribal identity, and that the federal government continue to fulfill its trust responsibilities toward the full-bloods.

Although the legislative history clarifies the language of the 1954 Act, the statutory language itself is somewhat ambiguous. The membership section of the 1954 Act reads as follows:

Effective on the date of publication of the final rolls as provided in section 677g of this title the tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in this subchapter. *New membership in the tribe shall thereafter be controlled and determined by the constitution and bylaws of the tribe and ordinances enacted thereunder.*

25 U.S.C. § 677d (emphasized portion added in 1956 amendment).

The Act defines what a "full-blood" is. "Full-blood" means a member of the tribe who possesses one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half, excepting those who become mixed-bloods by choice under the provisions of section 677c of this title.

25 U.S.C. § 677a(b).

The section of the Act defining when the membership rolls become final also contains some relevant language. That section provides, in pertinent part:

After disposition of all such appeals to the Secretary, and after all transfers have been made pursuant to section 677c of this title the roll of the full-blood members of the tribe, and the roll of the mixed-blood members of the tribe, shall be published in the Federal Register, and such rolls shall be final for the purposes of this subchapter, *but said sections shall not be construed as granting any inheritable interest in tribal assets to full-blood members of the tribe or as preventing future membership in the tribe, after August 27, 1954, in the manner provided in the constitution and bylaws of the tribe.*

25 U.S.C. § 677g (emphasized portion added in 1956 amendment).

*Legislative History of the 1954 Act*

In order to properly interpret 28 U.S.C. §§ 677–677aa ("the 1954 Act"), it is helpful to understand the backdrop against which the original statute and its amendments were enacted. During the period from 1943 to 1961, the policy of Congress and the Bureau of Indian Affairs ("BIA") was one of termination. The government wanted to eliminate the tribal structure and have the Indians become assimilated into society. *See generally* F. Cohen, *Handbook of Federal Indian Law* 152–80 (1982 ed.). The long-term aim of the policy was

the eventual discharge of the federal government's obligation, legal, moral, or otherwise, and the discontinuance of Federal supervision and control at the earliest possible date compatible with the government's trusteeship responsibility.

*Id.* at 157 (quoting Acting Commissioner of Indian Affairs William Zimmerman, Jr.'s Circular No. 3675 (May 28, 1948)). In 1953, Congress made a general declaration of its Indian policy, which passed by unanimous vote in both the House and the Senate.

[I]t is the policy of Congress, as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the

United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship....

H.R.Con.Res. 108, 83d Cong., 1st Sess., 67 Stat. B132 (1953). While there were some exceptions, the overall policy of Congress and the BIA was clear: the Indian tribes were to be disbanded and the Indians were to be integrated into American society. No longer were the Indians to be treated any differently than any other racial minority.

This is the context in which the 1954 Act was passed. The 1954 Act was one of many termination acts enacted between 1954 and 1962. *See* F. Cohen, *supra,* at 173–74. Apparently because of ambiguities in the unamended 1954 Act, there was some confusion in the Department of the Interior as to whether the 1954 Act was the first step in terminating the full-bloods as well as the mixed-bloods. In 1955, the Solicitor of the Department of the Interior held that it was such a first step, and interpreted the blood-quantum requirements of the 1954 Act as superseding the membership requirements of the Ute tribal constitution and bylaws.

> You have requested my opinion on the question whether membership in the full-blood group of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah, for the purpose of participating in the development program provided for that group by section 24 of the act of August 27, 1954, ... is to be determined by the constitution and bylaws of the Ute Tribe or by the provisions of the act of August 27, 1954.
>
> It is quite clear, I think, that the provisions of the act control the determination of membership in the full-blood group for the purposes of section 24.
>
> .    .    .    .    .
>
> [T]he membership of [the full-blood group] is controlled by the statutory provisions referred to above and not by anything contained in the constitution and bylaws of the Ute Tribe.... [T]he constitution and bylaws and any tribal ordinances in force on the date of the act

may be utilized only for the purpose of determining the "Ute Indian blood" of the mixed or full-blood member as those terms are defined in the act.

Dept. of Interior Solicitor's Opinion of Sept. 6, 1955, *reprinted in* 2 Op.Sol. on Indian Affairs 1690 (U.S.Dept.Interior 1979). Apparently, the Secretary adopted the opinion of his Solicitor.

While the Solicitor's interpretation is reasonable when viewed against the backdrop of the Indian policies of the era, the interpretation was wrong. In direct response to the Solicitor's opinion, Congress amended portions of the 1954 Act to make it clear that the Ute Tribal Constitution governs membership, not the 1954 Act.

> The purpose of S. 3779 is to amend the act of August 27, 1954 (68 Stat. 868), the Uintah-Ouray Termination Act. A similar bill, H.R. 10993, introduced by Congressman Dawson of Utah, was considered jointly with the reported bill.
>
> The act of August 27, 1954 (68 Stat. 6868), provided for the partition and distribution of the assets of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah between the mixed-blood and fullblood members thereof, and for the termination of Federal supervision over the property of the mixed-blood members of said tribe. It also provided for a development program for the fullblood members of the tribe.
>
> It was intended that after the mixed-blood members had been separated from the tribe and proper distribution made of the tribal property the fullblood members would continue the tribal government under the constitution, bylaws, and charter previously adopted by the tribe pursuant to the Indian Reorganization Act of June 18, 1934 (48 Stat. 984).
>
> On September 6, 1955, the Solicitor of the Department of the Interior in an opinion (M–36304) held that the determination of the fullblood membership of the tribe for the purpose of participating in the development program provided for in section 24 of the act of August 27, 1954, is controlled by the provisions of

said act and not by the constitution and bylaws of the Ute Indian Tribe.

The opinion of the Solicitor was not in accordance with the understanding of the Ute Indians. The Bureau of Indian Affairs concurred in the proposal to seek amendment of the act of August 27, 1954, for the purpose of expressing the original intention of the framers of the legislation. Sections 1 and 2 of S. 3770 amend section 5 and 8 of the act of August 27, 1954, to accomplish this purpose.

H.R.Rep. No. 2744, 84th Cong., 2d Sess. 1–2 (1956). *See also* S.Rep. No. 2432, 84th Cong., 2d Sess. 1–2 (1956) (containing virtually the same language as the House Report). Clearly, Congress amended the 1954 Act in 1956 to correct the Solicitor's mistaken interpretation of the 1954 Act.

### Administrative Interpretations of the 1954 Act

The Interior Department Solicitor's opinion of Sept. 6, 1955 was the first important administrative interpretation of the 1954 Act. Subsequent to the 1956 amendments by which Congress clarified the statutory language to show that the Solicitor was mistaken, the Secretary of the Interior allowed the Ute Tribe to determine its own membership, just as the Tribe had done since the tribal constitution became effective in 1937. In 1958, the Ute Tribe increased the blood-quantum required for membership to five-eighths Ute Indian blood. The Tribal Business Committee followed the same procedure it had always followed, enacting the blood-quantum requirement by ordinance. The ordinance was subsequently approved by the Superintendent of the Uintah and Ouray Agency and became effective. The Commissioner of Indian Affairs also reviewed the ordinance and advised the tribe by memorandum that he did not recommend rescission by the Secretary of the Interior.

From 1956 until 1983, the Secretary of the Interior took the position that the 1954 Act, as amended, did not mandate a particular blood-quantum requirement for tribal membership. Instead, the tribe was allowed to determine its own membership requirements by its constitution, bylaws, and ordinances. This position of the Interior Department was apparent as late as 1978. In that year, the Interior Department Regional Solicitor, William Robert McConkie, wrote a letter opinion on the authority of the Ute Tribe to change enrollment criteria. He took the firm position that the 1954 Act did not affect the Tribe's authority to control its own membership requirements.

The Congress intended that the tribe continue with identically the same authority as it had exercised in the past as regards enrollment ordinances.

We observe that over a 40-year period, the tribe has enacted a series of enrollment ordinances steadily increasing the requirement of blood quantum for membership in the tribe. The Secretary has approved each ordinance. The Congress blessed the procedure and endorsed the principle that the Tribal Business Committee had the authority to alter the formula for enrollment for persons enrolled subsequent to the time the Constitution was adopted. The current enrollment ordinance was enacted and approved 4 years after the Ute Partition Act. The Superintendent has approved per capita payments in the various annual budgets for decades.

Letter from William Robert McConkie to Superintendent, Uintah and Ouray Agency (Feb. 1, 1978). As is evident from Mr. McConkie's letter, the ability of the tribe to regulate its own membership was accepted without question by the Department in 1978.

The same Departmental position was stated once again in 1981. In that year, the Ute Tribal Business Committee passed an ordinance making a minor change in enrollment procedures. The ordinance gave the Uintah and Ouray Agency Superintendent the authority to determine membership in certain cases. The Superintendent at that time not only did not question the authority of the tribe to regulate its

own membership, but he questioned whether anyone outside the tribe could be given that authority.

The courts have consistently recognized that in the absence of express legislation by Congress to the contrary, an Indian tribe has complete authority to determine all questions of its own membership. The most recent example of this being the 1978, U.S. Supreme Court decision in *Martinez v. Santa Clara Pueblo.*

It is the policy of the Bureau of Indian Affairs to recognize the tribe's sovereign powers to decide who their members are for tribal purposes. In view of this, it is unclear whether the Superintendent could legally exercise the responsibility [to determine tribal membership].

Letter from L.W. Collier, Jr., Uintah and Ouray Agency Superintendent, to Ruby Black, Chairperson of the Tribal Business Committee (Feb. 23, 1981). While the Superintendent did note that express legislation by Congress could undermine tribal authority over its own membership, the Superintendent did not even hint that Congress had done so in the case of the Ute Tribe.

In 1983, however, the Secretary decided that the 1954 Act blood-quantum requirements superseded the enrollment criteria adopted by the tribe. *See* letter opinion by Ken Smith (Apr. 12, 1983) (Complaint, exh. J). The Secretary held the 1958 ordinance, which had a requirement of five-eighths Ute Indian blood, to be invalid. The sole reason for invalidating the ordinance was that the Secretary believed that the blood-quantum requirement of 25 U.S.C. § 677d still controls tribal membership.

Any and all Tribal Court decrees issued or tribal enrollment ordinances enacted after August 24, 1954, which establish or authorize a blood-quantum requirement for enrollment that differs from the Act cannot be enforced and such as presently exist are invalid. The enrollment criteria mandated by the Congress can only be changed by Congress.

*Id.* at 9. The Secretary has revoked his approval of the 1958 ordinance and contends that all those, and only those, who meet the blood-quantum requirements of the 1954 Act must be enrolled in the tribe and share in the tribal trust funds.

### Interpreting Legislation

█ When interpreting a statute that an administrative agency is charged to administer, a court will generally defer to a long-standing agency interpretation of the statute. *See Chevron, U.S.A. v. Natural Resources Defense Council,* —— U.S. ——, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). However, deference is not automatic, and a court cannot simply rubberstamp the agency interpretation.

The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Id.* 104 S.Ct. at 2782 n. 9 (citations omitted). While a court may not substitute its own interpretation of an ambiguous statute for a reasonable interpretation made by an agency, the intent of Congress is what controls. *See Chevron, U.S.A.,* 104 S.Ct. at 2782. When the intent of Congress is evident, a contrary administrative interpretation cannot stand no matter how reasonable it may be.

This case involves an administrative interpretative of statute, thus calling into play the canon of construction discussed above. But this case also involves Indians. There are, therefore, some special interpretative canons that must be followed in interpreting the 1954 Act.

█ Because the 1954 Act affects Indian rights, one important interpretive tool that is applicable in this case is the canon of construction which states that statutes affecting Indians are construed in favor of the Indians. *See County of Oneida v. Oneida Indian Nation,* —— U.S. ——, 105

S.Ct. 1245, 1258–59, 84 L.Ed.2d 169 (1985); *United States v. Felter,* 752 F.2d 1505, 1510 n. 8, 1511 (10th Cir.1985). This canon of construction is based on the notion that the Indian tribes are sovereign and autonomous peoples, and that their rights and privileges can be taken only when Congress expressly does so.

> Once powers of tribal self-government or other Indian rights are shown to exist, by treaty or otherwise, later federal action which might arguably abridge them is construed narrowly in favor of retaining Indian rights. The principle of a "clear and plain statement" before Indian rights can be abrogated also applies in nontreaty contexts.

F. Cohen, *Handbook of Federal Indian Law* 224 (1982 ed.); *see also County of Oneida,* 105 S.Ct. at 1258–59. To summarize the canon, a court interpreting legislation affecting the fundamental rights of an Indian tribe must presume that Congress intended not to abridge those rights. The rights can be taken away only by Congress, and then only if Congress plainly and unambiguously takes them away.

■ Another canon of construction applicable here is that a court should interpret a treaty as the Indians understand it. *See* F. Cohen, *supra,* at 224. In general, this canon applies only to Indian treaties, not to statutes affecting Indians. *See id.* at 224 n. 60. However, the difference between a treaty with an Indian tribe and a statute affecting the rights of an Indian tribe is one of form rather than substance. *See Blake v. Arnett,* 663 F.2d 906, 909–10 (9th Cir.1981); *United States v. Felter,* 546 F.Supp. 1002, 1012–13 (D.Utah 1982), *aff'd,* 752 F.2d 1505 (10th Cir.1985). In this case, the canon seems applicable because the 1954 Act was similar to a treaty. The Tribe's feelings and desires were important

to Congress. *See* H.R.Rep. No. 2744, 84th Cong., 2d Sess. 1–2 (1956) (stating that the opinion of the Solicitor regarding the 1954 Act was wrong because it "was not in accordance with the understanding of the Ute Indians"); S.Rep. No. 2432, 84th Cong., 2d Sess. 1–2 (1956). Indeed, the 1954 Act was drafted by the Ute Indian Tribe and was introduced at the request of the Tribe. H.R.Rep. No. 2493, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad.News 3355, 3357. Therefore, the understanding of the Indians is an important clue in interpreting the Act.

### The Proper Interpretation of the 1954 Act

■ After carefully examining the legislative history of the 1954 Act, this court finds that Congress expressly intended that the Ute Indian Tribe be able to control its own membership after the 1954 Act. The 1954 Act was never intended to prevent the Tribe from setting its own enrollment requirements. Because the Secretary's interpretation of the 1954 Act is contrary to Congress's intent, the Secretary's interpretation cannot stand.

The language of the unamended 1954 Act was ambiguous. The fact that termination policy was then in vogue undoubtedly influenced the Interior Department Solicitor's 1955 interpretation of the 1954 Act when he found that Congress had taken away the right of the full-bloods to control their own membership. In an era when whole tribes were being terminated, it was not unreasonable to suppose that Congress was preparing the full-bloods for eventual termination by taking away their right to control their membership.[1] The Solicitor's erroneous interpretation of the 1954 Act is therefore understandable.

---

1. Indeed, it appears that when the 1954 Act was passed, Congress was planning to eventually terminate the full-bloods as a tribe. *See* 25 U.S.C. § 677. However, there is no question that the full-bloods were not yet ready for termination. *See* H.R.Rep. No. 2493, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad.News 3355, 3356. Termination policy was repudiated before the full-bloods were ever considered to be ready for termination. The policy of termination was abandoned in favor of tribal self-government within a continuing federal trusteeship. *United States v. Felter,* 546 F.Supp. 1002, 1006 n. 5 (D.Utah 1982), *aff'd,* 752 F.2d 1505 (10th Cir.1985).

However, Congress corrected the Solicitor's error. Congress amended the 1954 Act to make it clear that the blood-quantum requirements were to be set by the Tribe itself, through its constitution and by-laws, and the ordinances enacted thereunder. 25 U.S.C. § 677d. Although amending the 1954 Act in a somewhat piecemeal fashion did not make it a model of clarity, the legislative history of the 1956 amendments to the Act is clear, express, and explicit. Congress expressly stated that the Solicitor's 1955 opinion that the 1954 Act took away the tribe's authority to determine its own membership was wrong.

Congressional intent is often difficult to divine. Not so in this case. Here the intent of Congress can be clearly read from the language of the 1954 Act, as amended, and its legislative history. Congress intended to divide the Ute Tribe into two groups, the full-bloods and the mixed-bloods. The mixed-bloods were to be given their share of tribal assets and then be assimilated into society. With some minor exceptions, they would no longer be treated as an Indian tribe. The full-bloods, on the other hand, were not to be terminated as a tribe. The Ute Tribe would continue as a tribe, with only the full-bloods as members and not the mixed-bloods. Congress intended that the blood-quantum requirements of 25 U.S.C. § 677d be used only at the time of division, to separate the full-bloods and mixed-bloods so that the mixed-bloods could be terminated.

The Secretary's main support for his finding that the 1954 Act controls tribal membership is one sentence in the 1954 Act. That sentence reads

Effective on the date of publication of the final rolls as provided in section 677g of this title the tribe shall thereafter consist exclusively of full-blood members.

25 U.S.C. § 677d. However, on closer examination, even this sentence does not support the Secretary's finding.

The sentence immediately following that sentence states that the mixed-bloods shall thereafter have no interest in the tribe. See id. This juxtaposition makes it clear that the terms "full-blood" and "mixed-blood" are used in the Act only to accomplish the division of the two groups, and that the terms have no meaning after the division has taken place. This interpretation has further support in the section defining "full-bloods" and "mixed-bloods," 25 U.S.C. § 677a(b), (c). Those definitions both apply only to "a member of the tribe." Id. Once the division has taken place, the reference to "a member of the tribe" in the mixed-blood definition is meaningless, since no mixed-blood would be a member of the tribe. Clearly, the sentence that the Secretary relied on merely means that the full-bloods will continue on as a tribe after the division while the mixed-bloods will not.

After the division of full-bloods and mixed-bloods was complete, Congress intended that the Ute Tribe, now consisting of full-bloods only, be able to set its own membership requirements, just as it had done since 1937. The tribe was to set these membership requirements in its constitution, bylaws, and ordinances, just as it had done since 1937. 25 U.S.C. § 677d. Nowhere is there any indication that Congress intended to take away the Tribe's right to determine its own membership.[2] Indeed, every indication, and there are many express indications, was that the Ute Tribe would continue to set its own membership requirements. The only change was that the mixed-bloods were no longer tribal members for the purposes of sharing in trust fund distributions.

The 1956 Amendments to the 1954 Act settled the confusion as to the effect of the 1954 Act on tribal enrollment requirements. As was stated in both the House

---

**2.** There is good reason why there is no such indication in the Act. The 1954 Act was drafted by the Tribe. It is simply inconceivable that the Indians would have given up such a fundamental right as the right to control membership. See Letter of Mitchell L. Bush, Jr., to Assistant Solicitor, at 3 (Jan. 28, 1983).

and Senate Reports, the intention of Congress had always been that the Tribe continue to govern itself under its constitution, bylaws, and charter. H.R.Rep. No. 2744, 84th Cong., 2d Sess. 1–2 (1956); S.Rep. No. 2432, 84th Cong., 2d Sess. 1–2 (1956). This intention was made express by the 1956 amendments.

The Department of Interior, after the 1955 Solicitor's opinion was corrected by Congress, adopted the position that the Tribe could control its own membership. Nothing further was said about the 1954 Act superseding the tribal constitution for twenty-five years. As Mr. McConkie noted, the Ute Tribe has controlled its own membership continually since the Ute Tribal Constitution was approved in 1937. Letter from William Robert McConkie to Superintendent, Uintah and Ouray Agency (Feb. 1, 1978). The Tribe's authority to control its membership was "approved" by the Secretary and "blessed" and "endorsed" by Congress. *See id.* The Tribe's right, as an autonomous body, to control its membership had been recognized and affirmed by Congress. It was not questioned.

Then, in 1981, the Secretary resurrected the 1955 opinion of the Interior Department Solicitor. *See* letter opinion by Ken Smith (Apr. 12, 1983) (Complaint, exh. J). The Secretary once again adopted the discredited idea that the 1954 Act took away the Tribe's right to control its own membership. In so doing, the Secretary failed to apply the appropriate canons of construction that must be applied to protect Indian rights. In so doing, the Secretary reversed his own agency's longstanding interpretation of the 1954 Act, an interpretation that was contemporaneous with the 1956 amendments. Most importantly, in so doing, the Secretary ignored the clear intent of Congress. The Secretary once again adopted the same 1955 Solicitor's opinion that had been expressly repudiated by Congress. *See* letter opinion by Ken Smith, at 6 (Apr. 12, 1983) (Complaint, exh. J) (relying on language quoted from the 1955 opinion).

The Secretary improperly reads the 1954 Act as a backhanded way of abrogating fundamental tribal rights. *See Menominee Tribe v. United States,* 391 U.S. 404, 412–13, 88 S.Ct. 1705, 1710–11, 20 L.Ed.2d 697 (1968). It is not. The straightforward intent of Congress is clear: the Ute Tribe was to retain control over its own membership after the 1954 Act. Even if the Act were silent on the issue of the right to control membership, the tribe would retain that right. But the Act is not silent on the issue. The 1954 Act, as amended, and its legislative history speak loudly and clearly that the Tribe retains the right to control its membership. Moreover, even if the intent of Congress were not clear, applying the canons of construction that must be applied in Indian law cases would lead directly to the same result.

Although the plaintiffs urge this court to apply the special canons of construction governing legislation affecting Indians, the Secretary claims that those canons are inapplicable here. The Secretary argues that this is not a case involving Indians, but that it is merely a case involving those who want to become Indians. In making that argument, however, the Secretary misses the point. It is exactly this type of case where the special canons of construction must be applied.

If the Secretary's interpretation of 25 U.S.C. § 667d is correct, Congress has taken away one of the most important rights an Indian tribe can have, the right to determine its own membership. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). The special canons of construction are designed to protect this type of precious right. Moreover, another important Indian right is also implicated in this case, the right of the Ute tribe to settle internal disputes in its own judicial system. *See Santa Clara Pueblo,* 436 U.S. at 63–66, 98 S.Ct. at 1679–81. The Secretary's actions effectively overrule the tribal court's decision in this case, thus sending a message to the tribe that it cannot be trusted to handle even

those disputes which affect only its own members.

Fundamental and precious Indian rights are at stake in this case. It is wrong to say that this case does not involve Indians and Indian rights, and that is to take a dangerous, myopic view of the issues involved. Congress, the Secretary, and courts such as this one must be careful to protect and safeguard Indian rights. Indians have little political power to protect their rights, and it is too easy for Indian rights to be eroded by mechanical, unthinking interpretations of federal law. Even though Indian rights can be easily overlooked and carelessly taken away, preservation of these rights is important to Indian and non-Indian alike.

> Like the miner's canary, the Indian marks the shift from fresh air to poison gas in our political atmosphere; and our treatment of Indians, even more than our treatment of other minorities, reflects the rise and fall in our democratic faith.

Cohen, *The Erosion of Indian Rights, 1950–1953: A Case Study in Bureaucracy*, 62 Yale L.J. 348, 390 (1953). Failing·to recognize the importance of the Indians' right to autonomy and self-government is to weaken democratic ideals upon which this country is founded. Such practices make our claims to democracy meaningless mouthings of an empty word.

Although this court finds that the Secretary's interpretation must be overturned for the reasons discussed above, one final argument raised by the Secretary should be addressed. The Secretary claims that his interpretation must be correct because the interpretation urged by the plaintiffs would result in mixed-bloods regaining membership in the tribe. Since Congress terminated the mixed-bloods, argues the Secretary, any interpretation which reverses that termination action is necessarily contrary to the intent of Congress. However, the mixed-bloods are not regaining tribal membership under this court's interpretation of § 677d. The correct inter-

pretation of the 1954 Act is completely consistent with congressional intent.

When the mixed-bloods received their share of the trust assets, they received assets that they can pass on to their children. Their property is now subject to the same inheritance laws as any other non-Indian, and the government no longer holds anything in trust for them. Their property is their own.

The full-bloods, however, are in a different situation. They cannot pass their property on to their children, since their property is being held in trust for them by the federal government. The full-bloods are still a tribe, and the child of a full-blood will receive a share of tribal assets only if he becomes a tribal member in his own right. The only thing of value a full-blood tribal member can pass on to his children is the right to become a tribal member.

The membership section of the tribal constitution at issue in this case was undoubtedly designed to allow tribal members to pass on a valuable right to their children. The section provides that the membership . of the tribe shall consist of

> All children born to any member of the Ute Indian Tribe of the Uintah and Ouray Reservation who is a resident of the Reservation at the time of .the birth of such children.

Constitution and By-laws of the Ute Indian Tribe of the Uintah and Ouray Reservation, art. II, § 1(b).

This language accomplishes its intended purpose. No person who received a share of tribal assets as a mixed-blood can now gain membership in the tribe under § 1(b) of article II of the tribal constitution. Nor can the children of a terminated mixed-blood claim membership in the tribe through their mixed-blood parent. The only way a child can gain membership in the tribe is by claiming membership through a parent who was a tribal member residing on the reservation when the child was born. Allowing a child in that category to have a right to tribal membership is

fully consistent with the tribal members' desires to give their children a birthright. Moreover, it is entirely consistent with the intent of Congress to terminate the mixed-bloods and to continue the tribe of full-bloods. The mixed-bloods have no more interest in the Tribe under this court's interpretation than any other non-Indian.

### Conclusion

The intent of Congress in enacting the 1954 Act is clear. Congress intended the Ute Tribe to retain control over its membership. Even if this intention was not clear from the 1954 Act and its legislative history, the special canons of construction applicable in this type of case lead unambiguously to the same result. Because the Secretary's contrary interpretation of the Act is plainly erroneous, it cannot stand.

As discussed in the previous memorandum decisions of this court, the Secretary has the authority and the responsibility to approve or disapprove tribal enrollment ordinances. Although this court holds that 25 U.S.C. § 677d does not preclude the Secretary from approving the enrollment ordinance at issue here, the Secretary must still consider other factors and determine whether to approve or disapprove the ordinance. This court trusts that the Secretary will act as quickly as possible on this matter, giving great weight to the importance of allowing the Tribe to control its own membership whenever possible.

Accordingly,

IT IS HEREBY DECLARED that 25 U.S.C. § 677d does not abrogate the power of the Ute Indian Tribe to control its own membership.

IT IS ORDERED that the Secretary's disapproval of the enrollment ordinance at issue in this case is set aside. The case is remanded to the Secretary to proceed as indicated in this decision.

This order will suffice as the court's action on the matter. Nothing further need be submitted by counsel.