# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

PERRY VON MURDOCK,

    Defendant-Appellant,

No. 96-4150

## ORDER ON PETITION FOR REHEARING
Filed December 22, 1997

Before **SEYMOUR**, Chief Judge, **PORFILIO** and **BALDOCK**, Circuit Judges.

Defendant-Appellant Perry Von Murdoch's petition for rehearing is DENIED.

Furthermore, the Court has made some revisions to the opinion published on October 20,

1997. The revisions have been made for clarification. Therefore, the Court will issue

today a revised opinion *nunc pro tunc* to October 20, 1997, and the opinion published on

October 20, 1997, is withdrawn.

        Entered for the Court

        PATRICK FISHER, Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 20 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

PERRY VON MURDOCK,

      Defendant-Appellant,

No. 96-4150

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 93-CR-308)

---

Kent A. Higgins of Idaho Falls, Idaho, for Defendant-Appellant.

Stephen Roth, Assistant United States Attorney (Scott M. Matheson, Jr., United States Attorney, and Carlie Christensen, Assistant United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **SEYMOUR**, Chief Judge, **PORFILIO** and **BALDOCK**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Perry Von Murdock was charged with violating 18 U.S.C. § 1165, which prohibits hunting on land belonging to an Indian Tribe without lawful authority or permission. He moved to dismiss the charge on the ground that he is an Indian with inherent rights to hunt and fish on the land in question. The district court rejected this argument, see United States v. Murdock, 919 F.Supp. 1534 (D. Utah 1996), and Mr. Murdock entered a conditional plea of nolo contendere. He appeals, renewing his argument that his status as an Indian precludes his conviction. We affirm.

I

This appeal requires the court to again address the operation and effects of the Ute Termination Act, 25 U.S.C. §§ 677-677aa (UTA or the Act). Although the Act was passed in 1954, it continues to generate considerable litigation, criticism, and controversy. See, e.g., Hackford v. Babbitt, 14 F.3d 1457, 1463-64 (10th Cir. 1994) (listing cases). The historical background leading up to the passage of the UTA is comprehensively set out in Hackford, id. at 1459-63, and we need not repeat it here. The purpose of the Act was to divide and distribute "the assets of the Ute Tribe of the Uintah and Ouray Reservation in Utah between the mixed-blood and full-blood members thereof," to terminate federal supervision over the mixed-blood members, and to prepare the full-

-2-

blood members for termination of federal supervision over them.  25 U.S.C. § 677.[1]

The Act defined full-bloods as those tribal members possessing one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half a degree, id. § 677a(b), and defined mixed-bloods as those members who did not possess sufficient Ute or Indian blood to fall within the definition of full-bloods and those full-bloods who chose to be designated as mixed-bloods, id. § 677a(c).  Pursuant to the Act, proposed rolls were drawn up listing the names of the mixed-bloods and the full-bloods, and were published in the Federal Register and relevant county newspapers.  Id. § 677g.  After a period during which protests over inclusion in or exclusion from the rolls could be made to the Secretary of the Interior, the proposed rolls became final.  Id.  Upon publication of the final rolls, it was declared that "the tribe shall . . . consist exclusively of full-blood members.  Mixed-blood members shall have no interest therein except as otherwise provided in this subchapter.  New membership in the tribe shall thereafter be controlled and determined by the constitution and bylaws of the tribe and ordinances enacted thereunder."  Id. § 677d.

Once the final rolls were published, the tribal assets were divided based upon the relative numbers of persons on the two rolls, id. § 677i, and the assets of the mixed-bloods were distributed to them individually, id. § 677l.  Those tribal assets that were "not susceptible to equitable and practicable distribution" were to be managed jointly by a

---

[1] We recognize that the term "mixed-blood" may be considered offensive.  The UTA uses that term, however, and to avoid confusion we do so as well.

tribal committee and authorized representatives of the mixed-bloods. Id. § 677i. Although the UTA did not specifically address tribal hunting and fishing rights, United States v. Felter, 752 F.2d 1505, 1509 (10th Cir. 1985), we have held that "the right to hunt and fish on the reservation is an 'asset[] not susceptible to equitable and practicable distribution' under § 677i," id. at 1512.

The Act provided that after distribution, mixed-bloods could dispose of their interests in the assets they received subject to the approval of the Secretary for a period of years, id. § 677n, and thereafter without federal supervision, id. § 677o. The United States actually ended its supervision over the affairs of the mixed-blood Utes and terminated its trust relationship with them on August 24, 1961. See Ute Termination Proclamation, 26 Fed. Reg. 8042 (1961).

II

Mr. Murdock was born in 1968. Both of his parents were listed on the final roll of mixed-blood Utes, and had received their respective shares of tribal property. Although Mr. Murdock's parents resided on the reservation when he was born, they were not members of the Tribe at that time, having lost their membership as a result of the UTA. See generally Chapoose v. Clark, 607 F. Supp. 1027 (D. Utah 1985). The Tribal Constitution effective when Mr. Murdock was born coupled with the UTA, which was

-4-

initiated and drafted by the Tribe, see Affiliated Ute Citizens v. United States, 406 U.S. 128, 143 (1972), together compel the conclusion that "[n]o person who received a share of tribal assets as a mixed-blood can now gain membership in the tribe under § 1(b) of article II of the tribal constitution. Nor can the children of a terminated mixed-blood claim membership in the tribe through their mixed-blood parent." Chapoose, 607 F. Supp. at 1036 (construing Ute Tribal Constitution, Art. II, § 11, in effect in 1968, with UTA).[2] Mr. Murdock has never been a member of the Tribe, and he is not eligible for membership under either the requirements of the Tribe in effect at his birth or as amended.

In 1993, Mr. Murdock applied for a permit to hunt big game on the reservation but was turned down because he did not meet the Tribe's requirements, which for his purposes required membership in the Tribe. See Murdock, 919 F. Supp. at 1537, 1538 & n. 10. He nevertheless shot an elk on the reservation, resulting in the misdemeanor charges which are the subject of this action.

Notwithstanding the operation of the UTA, the Tribal Constitution, and his lack of

---

[2] The membership provisions have since been amended. The Constitution currently in effect describes Tribal membership as follows:

> (a) All persons whose names appear on the official tribal roll as of April 15, 1988.
> (b) After April 15, 1988, members in the Ute Indian Tribe of the Uintah and Ouray Reservation shall be limited to those persons who possess at least five-eighths (5/8) degree Ute Indian blood derived from the blood quantum of Ute Indians whose names appear on the Full-Blood Roll of March 27, 1956, published April 5, 1956, in 21 Federal Register 2208 *et seq.*

Aplt. App. at 188.

a hunting permit, Mr. Murdock maintains he is a member of the Tribe and therefore has an inherent right to hunt and fish on the reservation. He bases this argument primarily upon a selective reading of the lower court's opinion in United States v. Felter, 546 F. Supp. 1002 (D. Utah 1982), and upon two Ninth Circuit cases addressing the operation of the Klamath Termination Act, see Kimball v. Callahan, 590 F.2d 768 (9th Cir. 1979) (Kimball II); Kimball v. Callahan, 493 F.2d 564 (9th Cir. 1974) (Kimball I). Mr. Murdock also contends the UTA is unconstitutional on numerous grounds. For the reasons set out below, we conclude Mr. Murdock is not a member of the Ute Indian Tribe and he must therefore obtain permission to hunt on Tribal land. We further hold that the Act, although perhaps open to criticism, is not unconstitutional.

A

Mr. Murdock's argument that he is a Tribal member is rooted in the Ninth Circuit's discussion of the Klamath Termination Act (KTA) in the <u>Kimball</u> cases. In those cases, Klamath Indians who had withdrawn from the Tribe under the KTA and their descendants sought a declaratory judgment that they nonetheless retained treaty rights granted to the Tribe to hunt and fish on ancestral tribal land free of state regulation. See <u>Kimball</u> I, 493 F.2d at 565. Under the KTA, a final roll of tribal members was drawn up and each person on the roll had to elect whether to withdraw from the tribe and receive his share of tribal property or to remain in the tribe and participate in a tribal management plan. <u>Id.</u> at 567. The KTA provided that "[m]embers of the tribe who receive the money value of their interests in tribal property shall thereupon cease to be members of the tribe," 25 U.S.C. § 564e(c), and further provided that "[n]othing in this subchapter shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty," <u>id.</u> § 564m(b).

In its first opinion, the Ninth Circuit relied upon <u>Menominee Tribe v. United States</u>, 391 U.S. 404 (1968), in which the Supreme Court addressed the Menominee Termination Act. That Act did not mention the Menominee Tribe's hunting and fishing rights, and the Court "decline[d] to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians." <u>Id.</u> at 412. Applying this

holding, the court in <u>Kimball</u> <u>I</u> pointed out that not only did Congress fail to clearly express its intent to abrogate the hunting and fishing rights of the Klamath Tribe in the KTA, but in fact Congress had expressly reserved those rights. <u>Kimball</u> <u>I</u>, 493 F.2d at 569. Accordingly, the court held:

> Since the Act provides that nothing in it shall abrogate any treaty fishing rights, we conclude that a Klamath Indian possessing such rights on the former reservation at the time of its enactment retains them even though he relinquishes his tribal membership or the reservation shrinks pursuant to the Act.

<u>Id.</u> The court further noted "[t]he Klamath Termination Act provides that withdrawn members of the tribe relinquish their interests in tribal property. Treaty rights to hunt and fish are, however, rights of the individual Indians." <u>Id.</u> at 569 n.9 (citation omitted). The court therefore reversed the district court's dismissal of the plaintiffs' action for failure to state a claim.

On remand, the district court held that "the rights of Indians to fish, hunt, and trap, free of state regulations, extended to the descendants of persons on the final tribal roll." <u>Kimball</u> <u>II</u>, 590 F.2d at 771. It was to this ruling that the appellate court turned its attention in the second appeal, where it revisited the operation of the KTA. In addressing the first <u>Kimball</u> ruling, the court in <u>Kimball</u> <u>II</u> emphasized that the earlier decision was based on the KTA's provision specifically reserving fishing treaty rights. <u>Id.</u> at 772. The court said:

> Prior to the Termination Act, the Klamath Tribe held treaty hunting, fishing, and trapping rights within its reservation in which the individual members

-8-

of the Tribe held rights of user. The Termination Act did not affect those rights. That an individual member withdrew from the Tribe for purposes of the Termination Act did not change his relationship with the Tribe as to matters unaffected by the Act, e.g., treaty hunting, fishing, and trapping rights.

Id. at 773. Applying these holdings to the issue of the exercise of treaty rights by the descendants of the terminated Klamaths, the court rejected the argument that the tribal roll was "final for purposes of determining who could exercise tribal treaty rights." Id. at 775. To the contrary, as the court pointed out, the KTA "specifically contemplated the continuing existence of the Klamath Tribe. . . . The Klamaths still maintain a tribal constitution and tribal government, which among other things establishes criteria for membership in the Tribe." Id. at 775-76 (footnote omitted).[3]

In the Felter cases, both the district court and this court considered the operation and effect of the Ute Termination Act on hunting and fishing rights in light of Menominee Tribe and the Kimball cases. Ms. Felter, a mixed-blood Ute whose tribal

---

[3] Although the Kimball decisions do not specifically address this fact, it is reasonable to infer from the court's discussion that the Klamath Tribe did not prohibit members who had withdrawn from the Tribe for purposes of the Act from continuing their Tribal membership for all other purposes. Significantly, the court noted in this regard that "one of the plaintiffs who withdrew from the Tribe pursuant to the Termination Act, is also a member of the Klamath Indian Game Commission." Kimball II, 590 F.2d at 776 n.14.

Unlike the mixed-blood Utes, the terminated Klamaths did not retain an interest in those tribal assets that were not susceptible to division and the KTA therefore did not create a joint management plan for such assets. Thus, the terminated Klamath who served on the Tribe Game Commission apparently did so by virtue of his status as a member of the Tribe despite his termination. Moreover, the descendants of those terminated Klamaths who maintained their status as Tribal members in the eyes of the Tribe were apparently themselves considered members by the Tribe after termination. As such they held rights of user in those Tribal assets.

status was terminated following the passage of the Act, was prosecuted under section 1165 for fishing on tribal lands without a tribal permit. The district court observed that the Act contained no language expressly abrogating the mixed-bloods' hunting and fishing rights and did contain language in section 677i preserving the mixed-bloods' interest in tribal assets not susceptible to division and distribution. Felter, 546 F. Supp. at 1017. Relying on Menominee Tribe, the court held that absent express abrogation, the Act did not extinguish either tribal hunting and fishing rights or individual interests in those rights. Id. at 1016-18. Because the mixed-bloods' rights in indivisible tribal assets such as hunting and fishing rights were specifically preserved by the Act, the court concluded that withdrawal from tribal enrollment under the Act did not "by itself extinguish vested hunting and fishing rights not otherwise affected by the act." Id. at 1018 (citing Kimball II, 590 F.2d at 773).

The district court then considered the nature of the hunting and fishing rights that were preserved in the Tribe and in which the mixed-bloods retained an interest. The court held:

> The rights and powers in question are *tribal* rights and powers . . . .
> An individual Indian's hunting or fishing right is measured wholly in
> relation to the nature and extent of the tribe's right. Tribal rights in
> property are owned by the tribal entity, and not as a tenancy in common of
> the individual members, including hunting and fishing rights.

Id. at 1021 (citations and footnote omitted). The court therefore held that although "withdrawal from membership in the tribe would generally result in the extinguishment of

-10-

all individual rights of user in tribal property," the mixed-bloods' rights of user were preserved pursuant to section 677i. Id. at 1023. The court characterized this right as "a *personal* right. It was neither alienable, assignable, transferable nor descendible." Id. In so holding, the court relied on Gritts v. Fisher, 224 U.S. 640 (1912), which held that

> the lands and funds belonged to the tribe as a community, and not to the members severally or as tenants in common. The right of each individual to participate in the enjoyment of such property depended upon tribal membership, and when that was terminated by death or otherwise the right was at an end. It was not alienable or descendible.

Id. at 642.

Applying the above analysis to the facts before it, the district court concluded:

> Individual mixed-blood Utes enrolled upon the final mixed-blood Roll (and still living) are thus entitled to hunting and fishing privileges within the Ute reservation equivalent to those afforded members of the tribe as now defined. As each of the mixed-blood Utes passes away, his or her personal right of user is extinguished, it being neither inheritable or transferable.

Felter, 546 F. Supp. at 1025 (footnote omitted) (citing F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 185 (1942 ed.)). Accordingly, because tribal members were not at that time required to have a tribal permit in order to exercise their user rights to hunt and fish, the court held that Ms. Felter's lack of such a permit did not deprive her of that right. Her conviction under section 1165 for fishing on tribal land without lawful authority or permission therefore could not stand.

We affirmed on appeal, describing the district court's opinion as scholarly and its

reasoning persuasive. See United States v. Felter, 752 F.2d at 1506. Like the district court, we found that the language in Menominee Tribe precluded "imput[ing] congressional intent to abrogate Indian rights to hunt and fish, absent explicit language to that effect." Id. at 1510. We also agreed with the district court that although the right to hunt and fish on tribal land is a tribal right, individual Indians hold a right of user in those rights that the UTA did not abrogate. Id. at 1509. Accordingly we "refuse[d] to impute to Congress an intent to abrogate the right of the mixed-blood Ute Indians to hunt and fish on reservation land and instead [held] that the right to hunt and fish on the reservation is an 'asset[] not susceptible to equitable and practicable distribution' under § 677i." Id. at 1512.

We have discussed the above cases in detail because they are the basis upon which Mr. Murdock claims a right of user in the Ute Tribe's hunting and fishing rights, and because we are ultimately persuaded their analysis and holdings cannot be read to support Mr. Murdock's claim. Although Mr. Murdock has shifted ground somewhat during the course of this litigation,[4] we distill his arguments into two main contentions. First, he asserts that the reasoning of the Kimball cases applies fully here, and that because the Klamath Termination Act did not terminate the user rights of the descendants of terminated Klamaths, his user rights in tribal property as the descendant of mixed-blood Utes were likewise not terminated by the Ute Termination Act. Second, he asserts that

_____

[4] Mr. Murdock concedes that the UTA applies to him as well as to his parents, Reply Br. of Aplt. at 1-2, and he does not claim that he inherited rights of user from his parents, id. at 2.

-12-

the tribal rights at issue are those of the Uintah Band and not the Ute Tribe, and that he

has rights of user as a member of the Uintah Band.  We address each argument in turn.[5]

Mr. Murdock's attempt to rely on the <u>Kimball</u> cases is unavailing for several

reasons.  While both the district court and this court cited to the <u>Kimball</u> cases in

discussing Ms. Felter's case, those citations did no more than acknowledge and agree

with the Ninth Circuit's conclusion that under <u>Menominee Tribe</u>, congressional intent to

abrogate tribal treaty and statutory rights will not be found absent express language to that

effect.  <u>See</u>, <u>e.g.</u>, <u>Felter</u>, 752 F.2d at 1509-10 & n.8; <u>Felter</u>, 546 F. Supp. at 1011, 1018.

We also cited with approval <u>Kimball II</u>'s holding that individual Indians enjoy a right of

user in their tribe's hunting and fishing rights.  <u>See Felter</u>, 752 F.2d at 1509.  However, to

the extent Mr. Murdock asserts the <u>Kimball</u> cases as authority for the proposition that he

holds a right of user in Ute Tribal rights, his argument is precluded by <u>Felter</u>.

As we have discussed, the district court in <u>Felter</u> specifically concluded that

because rights of user are dependent upon the holder's status as a tribal member, those

rights are personal to the member and therefore cannot be conveyed to another through

inheritance or in any other way.  <u>Felter</u>, 546 F. Supp. at 1021, 1023-25 & n.52.  Although

---

[5] Mr. Murdock also asserts that the federal courts are without jurisdiction in this proceeding because the action is in essence one to enforce a proclamation issued by the Ute Tribe and the Ute Development Corporation.  As with many of Mr. Murdock's arguments, this one is based upon our acceptance of his position that he is a Tribal member entitled to hunt and fish on reservation lands.  We hold that he is not.  Tribal jurisdiction over this offense is therefore not exclusive, and his argument is foreclosed by <u>United States v. Felter</u>, 752 F.2d 1505, 1512 n.11 (10th Cir. 1985).

-13-

technically dicta, the court's observation that the children of mixed-bloods do not enjoy rights of user through inheritance is nonetheless the inescapable logical result of the nature of those rights. We therefore adopt that principle and apply it here.

Moreover, we do not view our holding as in conflict with the Kimball cases. We construe those cases as deciding that the tribal rights to hunt and fish granted the Klamath Tribe and the rights of user held by individual members were not terminated by the KTA, and that the Tribe itself continued to exist and define its membership and the concomitant rights of user after the KTA went into effect. We further read the result in those cases as resting on the fact that the descendants of the terminated Klamaths who retained their rights of user did so not by virtue of inheritance but *through their own continued membership in the Klamath Tribe*. To the extent those cases can be read as allowing rights of user to pass by inheritance, we decline to follow them.

Although conceding that he cannot inherit rights of user from his parents, Mr. Murdock argues that his parents remained members of the Ute Tribe after passage of the UTA and that he was therefore born a member of the Tribe. In so doing, Mr. Murdock relies on language from the above cases stating that the termination acts effected only an incomplete withdrawal from tribal membership. We have already noted, however, that the UTA specifically declared an end to the tribal membership of mixed-bloods once they received their share of the tribal assets, and recognized the right of the Tribe to *thereafter* determine new members. See 25 U.S.C. § 677d; Chapoose, 607 F. Supp. at 1034-36.

-14-

Because Mr. Murdock's parents were not members of the Tribe at the time of his birth, he did not become a member pursuant to the Ute Tribal Constitution in effect at the time. Nor has he subsequently met the Tribe's requirements for membership. "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 72 n.32 (1978). We are not at liberty to define tribal membership in a manner at odds with the Tribe's exercise of its sovereign right to do so.

Alternatively, Mr. Murdock contends he remains a member of the Uintah Band, which together with two other Bands joined to form the Ute Tribe, and he therefore retains hunting and fishing rights by virtue of that membership. This argument is untenable, however, in light of the history of the formation of the Ute Tribe and the provisions of its Constitution.

The current Uintah and Ouray Reservation is formed from portions of two prior reservations, the Uintah Valley Reservation, which was originally inhabited by the Uintah and Whiteriver Bands of Ute Indians, and the Uncompahgre Reservation, which was originally inhabited by the Uncompahgre Band. See Hackford, 14 F.3d at 1459; Murdock, 919 F. Supp. at 1536. In 1937, pursuant to the Indian Reorganization Act, 25 U.S.C. §§ 461-79, the three Bands joined together to form the Ute Indian Tribe of the Uintah and Ouray Reservation, and adopted a constitution and bylaws.[6] Hackford, 14

_____

[6] In the late nineteenth century, in response to the expansion westward of white settlers,
(continued...)

-15-

F.3d at 1461. The Preamble to the Constitution of the Ute Indian Tribe states that "the

Ute Indians of the Uintah, Uncompahgre and Whiteriver Bands hereafter to be known as

the Ute Indian Tribe of the Uintah and Ouray Reservation . . . do ordain and establish this

Constitution for the Ute Indian Tribe of the Uintah and Ouray Reservation." Aplt. App.

at 188. Article I provides that "[t]he Jurisdiction of the Ute Indian Tribe of the Uintah

and Ouray Reservation shall extend to the territory within the original confines of the

Uintah and Ouray Reservation . . . ." Id. Significantly, Article VI, § 4 states:

> Any rights and powers heretofore vested in the Tribe or bands of the
> Uintah and Ouray Reservation but not expressly referred to in this
> Constitution shall not be abridged by this article, but may be exercised by
> the people of the Uintah and Ouray Reservation *through the adoption of*
> *appropriate By-laws and constitutional amendments*.

Id. at 192 (emphasis added).

The Constitution thus makes clear that the Bands ceased to exist separately

outside the Ute Tribe, that jurisdiction over what was formerly the territory of the Uintah

Band was to be exercised by the Ute Tribe, and that the rights formerly vested in the

---

[6](...continued)
the federal Indian policy that gave rise to the creation of reservations shifted toward a policy of assimilation. Hackford v. Babbitt, 14 F.3d 1457, 1459 (10th Cir. 1994). Pursuant to this shift, Congress passed the General Allotment Act, 25 U.S.C. §§ 331-90, which "allowed the breakup of Indian reservations into individual homesteads on which, Congress expected, the Indians would farm and become self-sufficient." Id. In 1934, Congress discontinued its assimilation policy and passed the Indian Reorganization Act, which "halted the allotment of tribal land and recognized the right of tribes to draw up constitutions and corporate charters for self-governance." Id. at 1461. The Ute Termination Act is the product of yet another shift in federal policy that occurred in the 1950s and sought to reduce federal involvement in Indian affairs. Id. at 1461-62.

Uintah Band were to be defined by the Ute Constitution and exercised by the Ute Tribe. In light of these provisions, Mr. Murdock's argument that the Uintah Band's hunting and fishing rights retain a separate existence and belong only to the Uintah Band is groundless. Even if Mr. Murdock is correct that the Uintah Band continues to maintain its own identity, under the Ute Constitution the Band does so only within the context of the Ute Tribe. Accordingly, Mr. Murdock has no right of user in hunting and fishing rights originally granted to the Uintah Tribe.

B

Mr. Murdock also challenges the constitutionality of the UTA with a laundry list of claims, a number of which he has no standing to raise and many of which are supported by little or no authority. We begin our consideration of his arguments by setting out the legal principles which govern our analysis and allow us to dispose of most of his assertions summarily.

"[T]he power of the Federal Government over the Indian tribes is plenary." National Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845, 851 (1985).

> [F]ederal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications. Quite the contrary, classifications expressly singling out Indian tribes as subjects of legislation are expressly provided for in the Constitution and supported by the ensuing history of the Federal Government's relations with Indians.

. . . .

[S]uch regulation is rooted in the unique status of Indians as a separate people with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a racial group consisting of Indians.

United States v. Antelope, 430 U.S. 641, 646 (1977) (footnote and internal quotations omitted). Moreover, this court has upheld the UTA against an assertion that it "arbitrarily and capriciously discriminates against the mixed-blood group." Ute Tribe of the Uintah & Ouray Reservation v. Probst, 428 F.2d 491, 498 (10th Cir. 1970 ) (on denial of reh'g) (per curiam). We stated that "the classification into the two groups was supported by the Indians, was relevant to the purposes of the legislation, and had a reasonable basis. We find no arbitrary or capricious discrimination which violates Fifth Amendment due process." Id.

Notwithstanding the above authority, Mr. Murdock contends the UTA is racially discriminatory because it is directed to the mixed-bloods as a racial class rather than as a tribal entity. We disagree. The purpose of the UTA was to end federal supervision over the Ute Tribe. In pursuit of that goal, Congress determined that not all Tribal members were similarly situated with respect to their ability to manage their own affairs. Accordingly, Congress divided the Tribe into two classes, one whose members Congress had reason to believe were approaching the point at which federal supervision over them could be ended, and one whose members were not. This classification was part of a

statute in which Congress dealt with the Tribe as a Tribe.[7]  We conclude the Act does not

constitute improper racial discrimination, and we reject Mr. Murdock's claims that the

Act violates due process and equal protection under the Fifth Amendment.

Mr. Murdock asserts the Act violated procedural due process by failing to provide

personal notice to those affected by its operation.  The Act provided for notice by

publication in the Federal Register and "in a newspaper of general circulation in each of

the counties of Uintah and Duchesne in the State of Utah."  25 U.S.C. § 677g.  Mr.

Murdock was not yet born when the Act took effect, he has never been a Tribal member

with interests which would trigger the right to notice, and he therefore has no standing to

challenge the adequacy of the notice provision.

Mr. Murdock further contends the Act is violative of the First Amendment because

it interfered with the internal affairs of the Tribe and altered its philosophical cast, thereby

changing the Tribe's message.  To the extent that Mr. Murdock is asserting an

infringement of the Tribe's rights, he has no standing to do so.  Mr. Murdock also

contends the Act is unconstitutional because it prevents him from expressing his own

First Amendment right to identify with the Tribe and to vote in Tribal elections.  This

---

[7] Indeed, any statute that regulates Indian affairs must of necessity have some means of distinguishing individuals who are Tribal members from those who are not for purposes of the legislation.  "Literally every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians living on or near reservations. If these laws . . . were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased . . . ."  United States v. Antelope, 430 U.S. 641, 645 (1977) (internal quotations omitted) (alterations in original).

argument overlooks the fact that it is the Tribal Constitution's definition of those who may be Tribal members that prevents Mr. Murdock from participating in Tribal affairs. The Act did no more than allow the Tribe to establish its own criteria for membership, under which Mr. Murdock is not a member of the Tribe.

We have considered Mr. Murdock's remaining challenges to the constitutionality of the Ute Termination Act and we find them either unsupported by citation to relevant authority or without merit. Accordingly, we **AFFIRM** the judgment of the district court.