428 F.2d 491
 UTE INDIAN TRIBE OF the UINTAH AND OURAY RESERVATION, a body politic and corporate of the United States of America, Plaintiff-Appellant,
v.
Parley PROBST and Oranna B. Moosman, Administratrix of the Estate of Elizabeth C. Bumgarner Poowegup, Deceased, Defendants-Appellees.
UTE INDIAN TRIBE OF the UINTAH AND OURAY RESERVATION, a body politic and corporate of the United States of America, Plaintiff-Appellee,
v.
Parley PROBST, Defendant-Appellant, and
Oranna B. Moosman, Administratrix of the Estate of Elizabeth C. Bumgarner Poowegup, Deceased, Defendant-Appellee.
 No. 125-69.
 No. 126-69.
 United States Court of Appeals, Tenth Circuit.
 April 20, 1970.
 Rehearing Denied June 5, 1970.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John S. Boyden, Salt Lake City, Utah (Stephen G. Boyden, Salt Lake City, Utah, on the brief), for Ute Indian Tribe, appellant in No. 125-69 and appellee in No. 126-69.
 Wayne L. Black, Salt Lake City, Utah (Robert D. Moore, Salt Lake City, Utah, on the brief), for Parley Probst, appellee in No. 125-69 and appellant in No. 126-69.
 James J. Smedley, Heber, Utah (David Sam, Duchesne, Utah, on the brief), for Oranna B. Moosman, appellee in both Nos. 125-69 and 126-69.
 Before MURRAH, Chief Judge, and BREITENSTEIN and HICKEY, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 We have here a three-way fight over Indian land. Plaintiff-appellant Ute Indian Tribe sued for certain equitable relief and for cancellation of a deed given by defendant-appellee Oranna Moosman as administratrix of the estate of Elizabeth Bumgarner Poowegup to defendant-appellant Parley Probst. Jurisdiction lies under 28 U.S.C. § 1362 because the matter in controversy arises under the Act of August 27, 1954, 25 U.S.C. § 677 et seq. The answer of Probst asserts the validity of the deed and counterclaims for damages. The administratrix denies that the Tribe has any right to the land and, by way of cross-claim against Probst, asserts that the deed to him is void. The district court held that the administratrix was entitled to the land. Both the Tribe and Probst appeal.
 
 
 2
 The Act provides for the division of the assets of the Tribe between the full-blood and mixed-blood groups, the termination of federal supervision over the latter, and the development of a program for such termination over the former. After the division of the assets between the two groups, the mixed-bloods were to devise a plan for the distribution of its assets among its members. 25 U.S.C. § 677l. If a majority of the mixed-blood group decided that partition of any land was impracticable and, if the Secretary of the Interior approved, the land could be sold and the proceeds divided among members of the group. 25 U.S.C. § 677l (5). Before the termination of federal supervision, a mixed-blood could dispose of his interest in acquired tribal property only with the approval of the Secretary. See 25 U.S.C. § 677n and 25 CFR § 243.3 (1966 ed.).[1] Federal supervision over tribal land terminated when a patent issued thereto. 25 CFR § 243.2(h). Until August 27, 1964, a patent conveying any tribal land to a mixed-blood had to provide that until that date members of the Tribe had the right of first refusal of an offer to sell. 25 U.S.C. § 677n and 25 CFR § 243.4.
 
 
 3
 In the division between the groups, the mixed-bloods received the 3,200 acres of land in question. They decided that partition was impracticable and that the land should be sold. It was appraised at $26,600. Secretarial approval is conceded.
 
 
 4
 Elizabeth, a mixed-blood, submitted the high bid of $26,016 for the land. She did not have the necessary money and interested Probst, a non-Indian, in the land. A written contract was prepared and executed on October 28, 1959, whereby Elizabeth sold to Probst for $35,000 and Probst went into immediate possession. The contract recognized that no patent had been issued and that Elizabeth would have to comply with the first-refusal provision of the statute. Elizabeth gave Probst a $35,000 mortgage on the land to assure compliance with the contract terms. The mortgage was duly recorded. Neither the contract nor the mortgage was submitted to the Secretary for his approval.
 
 
 5
 On August 11, 1960, the Secretary promulgated regulations as authorized by the Act. 25 U.S.C. § 677z. See 25 CFR §§ 243.1-243.12 (1966 ed.). A patent was issued to Elizabeth on September 20, 1960. It contained the first-refusal provisions required by the statute and regulations. On November 11, 1960, Elizabeth and Probst executed an amendment to the October 28, 1959, contract. It provided that certain escrowed funds be released to Elizabeth; that the required offering should not be made "until such time as the Party of the First Part [Probst] requests that the same be made"; and that if such offering was made at Probst's request certain conditions for his protection should be included within the offer.
 
 
 6
 Elizabeth was killed in an accident on November 27, 1963, without making the offer and without conveying to Probst. Oranna was appointed administratrix of Elizabeth's estate. Probst filed a creditor's claim against the estate on the basis of the 1959 sale contract and mortgage. Pursuant to court order, the administratrix conveyed the land to Probst by a September 21, 1964, deed which was recorded on October 5, 1964. The pending suit was brought by the Tribe on September 20, 1967.
 
 
 7
 The trial court held that Probst was guilty of fraud; that Elizabeth was not in pari delicto; that the first-refusal provisions "were as much or more for the protection of the Indian owner as for the protection of the members of the Tribe"; that public policy favored the Indian owner; that the impossibility of reconstructing what would have occurred had there been an offering by Elizabeth and the increase in value of the property supported the award of the land to the administratrix; and that she was not barred by any statute of limitations, by laches, or by estoppel.
 
 
 8
 The construction and application of § 677n is decisive. The land was a tribal asset. It was real property as that term is used in the section because it was acquired by a mixed-blood. See definition of "real property" in 25 CFR § 243.2 (g). The patent to Elizabeth contained the first-refusal provision. Neither she nor her administratrix made the required offer. The question is the effect of such non-action.
 
 
 9
 The arguments of the parties lead us into many by-paths which need not be traveled. The Act was intended to distribute tribal property and terminate federal supervision over the mixed-bloods. See § 677 and House Report No. 2493, 2 U.S.Code Cong. & Admin.News '54, pp. 3355-3359. We are aware of no legislative history which illuminates the intent of the first-refusal provisions. The reliance of the Tribe and the administratrix on the provision of § 677i that a contract made in violation of that section shall be null and void is misplaced. As we read that section it applies to undivided interests and not to real property which a mixed-blood has acquired by purchase. Our concern is whether the statute confers upon the Tribe the unconditional right to meet the price at which the selling mixed-blood offers land acquired from tribal assets.
 
 
 10
 Contrary to the trial court, we believe that Congress, by incorporating § 677n into the Act, had in mind primarily the protection of the Tribe and only secondarily, if at all, the protection of the selling mixed-blood. The first-refusal provision gave the Tribe, for a ten-year period, the opportunity to recover land which it had lost by the division of assets between the two groups. The language of § 677n means that Congress believed it preferable that tribal land acquired by a mixed-blood, who determined to sell before 1964, return to the Tribe if the Tribe wanted it and could match the offering price. This procedure does not assure a higher price to the mixed-blood, because the Tribe is required only to meet the offering price. Only in the event two or more members of the Tribe compete for acquisition of the land does bidding take place. 25 CFR § 243.7.
 
 
 11
 The statute must be construed and applied to effectuate the congressional intent. United States v. American Trucking Associations, Inc., 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345; see also Federal Trade Commission v. Fred Meyer, Inc., 390 U.S. 341, 348-352, 88 S.Ct. 904, 19 L.Ed.2d 1222. We believe that when a mixed-blood determined within the ten-year period to dispose of his acquired interest, the Tribe had the right to have the property offered to it in accordance with the statute and regulations. Elizabeth determined to sell the land at or before the time when she entered into the first contract with Probst. She did not offer the land to the Tribe. Her administratrix in turn did not offer it, but instead waited until the expiration of the ten-year period and then gave Probst a deed. The Tribe was thus deprived of its statutory right. It makes no difference whether this result was intentional or unintentional or whether it was the upshot of a fraudulent scheme, good-faith ignorance, or ineptness. Whatever the reason, the inescapable fact is that the Tribe was not given the opportunity to reacquire the land.
 
 
 12
 Probst argues that the assertion of this right is barred by the Utah statute of limitations, Utah Code Ann. 1953, § 78-12-26(3), which provides that a fraud action must be brought within three years after the discovery by the aggrieved party of the fraudulent act. Holmberg v. Armbrecht, 327 U.S. 392, 395-397, 66 S.Ct. 582, 90 L.Ed. 743, holds that a suit in a federal court to enforce in equity a federally created right is not controlled by the forum statute of limitations. The Tribe seeks in federal court equitable relief from the denial of a federal statutory right. There is no applicable federal statute of limitations. Under Holmberg the state statute does not apply and the question is whether the Tribe is chargeable with laches.
 
 
 13
 The essence of the defense of laches is prejudice to a defendant through unconscionable delay by a plaintiff in the assertion of his claim. Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551, and Potash Co. of America v. International Minerals & Chemical Corp., 10 Cir., 213 F.2d 153, 154. Unconscionable delay can occur only after a party discovers, or by the exercise of reasonable diligence could have discovered, the wrong of which he complains. Here the wrong was the denial to the Tribe of its right of first refusal. To sustain his claim of knowledge on the part of the Tribe, Probst relies on November 18, 1959, minutes of a tribal meeting stating that Elizabeth was contemplating the sale of the land, the recording of the mortgage, the payment by Probst of taxes on the land, a 1960 telephone call between the lawyers for the Tribe and Probst, a conversation after Elizabeth's death among Probst, his lawyer, and a tribe official, and the records of the Bureau of Indian Affairs showing that Probst advanced the purchase price to Elizabeth. These facts, considered separately or together, do not show any action by Probst or Elizabeth to deny to the Tribe its statutory right of first refusal. The denial of that right first occurred in the November 11, 1960, amendment to the October 28, 1959, sale agreement. In that document Elizabeth agreed not to offer the land to the Tribe without a request from Probst. The Tribe did not have knowledge of the amendment until the summer of 1966. Even if the Tribe is charged with constructive notice of the recorded deed from the administratrix to Probst, we believe that the delay of less than three years in the institution of the suit was not unconscionable. In any event, Probst has shown no prejudice resulting from the delay. He has been in possession of the land since 1959 and has enjoyed the benefits of its use. In our opinion laches is no bar to the claim of the Tribe.
 
 
 14
 The question remains of what relief the court should fashion to remedy the wrong. When federally secured rights are invaded, federal courts must adjust their remedies to grant the appropriate relief. J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L. Ed.2d 423; see also Jones v. Alfred H. Mayer Co., 392 U.S. 409, 414, n. 13, 88 S.Ct. 2186, 20 L.Ed.2d 1189. It is impossible to reconstruct what would have occurred if Elizabeth had made the required offering. In addition, the ten-year period fixed by the statute has passed.
 
 
 15
 To do equity a decree should put the parties in the position where they would have been if the required offer had been made. From our review of the record we are convinced that this should be done without regard to all the charges and countercharges of fraud, misconduct, and bad faith. When everything else is put aside, the fact remains that Probst, Elizabeth, and the administratrix by their actions deprived the Tribe of a federally created right and that right must be vindicated by affording the Tribe an opportunity to acquire the land.
 
 
 16
 The administratrix points out that the offer required by § 677n must be made "to the members of the tribe" and argues that the Tribe itself may not be the purchaser of the land. We are not persuaded. Under the regulations, 25 CFR § 243.6, the superintendent was required to notify the Tribe of any offers to sell. As found by the trial court in an unchallenged finding of fact, the Tribe had on occasion purchased property offered by mixed-bloods between 1960 and 1964 and these purchases had been approved by the Secretary. Two letters from Assistant Secretaries of the Interior state that the offering required by the Act ran to the Tribe as well as to its members. Construction of an act by the agency charged with its administration should be followed unless there are compelling indications that it is wrong. Red Lion Broadcasting Co., Inc. v. Federal Communications Commission, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371. Here there are no such indications. What the members of the Tribe can do individually they can do collectively as a tribe.
 
 
 17
 The administratrix argues that to permit the Tribe to purchase will deprive her of the advantage which might be secured through competitive bidding. The argument comes too late. If either she or Elizabeth desired competitive bidding, they each had time to make the offer which the statute requires; and they chose not to do so. In any event, the first-refusal provision is primarily for the benefit of the Tribe and its full-blood members and only incidently for the benefit of the selling mixed-blood. We see no reason why the Tribe should not have an opportunity to buy the land without putting it up for bidding.
 
 
 18
 A decree should be entered permitting the Tribe to purchase the land within a reasonable time by the payment to Probst of his purchase price, $35,000, plus interest thereon from October 28, 1959, to November 11, 1960. We cut off the interest on the latter date because then Probst and Elizabeth made the amendment to the contract which circumvented the statute. The payment by Probst of taxes on the land and the minor improvements which he made thereon are set off by the fact that he has had the use of the land for over ten years. The decree should make appropriate provisions for investiture of title to the land in the Tribe upon the payment by it of the required amount to Probst.
 
 
 19
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Section 677n provides:
 "Any member of the mixed-blood group may dispose of his interest in the tribal assets prior to termination of Federal supervision, subject to the approval of the Secretary. In the event a member of the mixed-blood group determines to dispose of his interest in any of said real property at any time within ten years from August 27, 1954, he shall first offer it to the members of the tribe, and no sale of any interest, prior to termination of Federal supervision, shall be authorized without such offer to said members of the tribe in such form as may be approved by the Secretary. After termination of Federal supervision the requirement of such offer, in form to be approved by the Secretary, shall be a covenant to run with the land for said ten-year period, and shall be expressly provided in any patent or deed issued prior to the expiration of said period."
 
 
 ON REHEARING
 
 20
 PER CURIAM.
 
 
 21
 We have before us the separate petitions of appellee Oranna Moosman and appellee Probst for rehearing.
 
 
 22
 Oranna asserts that the Termination Act, 25 U.S.C. § 677 et seq., as construed and applied is unconstitutional because it denies due process to the mixed-bloods in that the enforcement of the first-refusal right of the Tribe arbitrarily and capriciously discriminates against the mixed-blood group. The theory appears to be that, because of the economic situation of the mixed-bloods and because of their continuing need for federal supervision, the protective provisions of the Act are for their benefit and the use of those provisions for the benefit of the Tribe is an unreasonable classification which denies equal protection.
 
 
 23
 The record contains no evidence of their economic condition or need for continued supervision. The legislative history shows that the mixed-bloods desired termination of federal supervision. This appears in the following excerpt from House Report No. 2493, 83rd Cong. 2d Sess., 2 U.S.Code Cong. & Admin.News '54, pp. 3355, 3356:
 
 
 24
 "The action proposed by this bill will permit the mixedbloods to progress toward termination of Federal supervision without being held back by the fullbloods who desire continuation of wardship status. According to testimony from members of the Ute Tribe, the majority of the mixedblood group feel that they are ready for a termination of Federal supervision over their property and the fullblood Indians believe that they are not ready for such action."
 
 
 25
 Although the Fifth Amendment does not contain an equal protection clause as does the Fourteenth Amendment, which applies to the states, discrimination may be so unjustifiable as to violate due process. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884. In the case at bar the classification into the two groups was supported by the Indians, was relevant to the purposes of the legislation, and had a reasonable basis. We find no arbitrary or capricious discrimination which violates Fifth Amendment due process. See Detroit Bank v. United States, 317 U.S. 329, 337-338, 63 S.Ct. 297, 87 L.Ed. 304.
 
 
 26
 Oranna says that the action of the court usurps the power of the Secretary to approve the sale and that, because the Secretary never approved the sale, the deed to Probst is ineffective. Probst argues that his deed is good because it was executed after the expiration of the ten-year period during which the Tribe had the first-refusal right. The facts are that no one asked for the approval of the Secretary and that the machinations of Probst, Elizabeth, and Oranna delayed the execution of the deed until after the ten-year period. Elizabeth determined to sell to Probst in October, 1959, and made a $9,000 profit on the sale. We are concerned with the rights of the Tribe. The failure of Probst, Elizabeth and Oranna to seek the approval of the Secretary and to offer the land to the Tribe cannot defeat the right of the Tribe.
 
 
 27
 Probst argues for the first time that the first-refusal provision of § 677n applies only to distributive shares and not to purchased property. The land was a tribal asset which was acquired through purchase by Elizabeth in accordance with § 677l(5). Section 677n permits a mixed-blood to dispose of his interest in tribal assets before termination of federal supervision on the condition that the Secretary approve. The section goes on to say that if a mixed-blood determines to dispose of his interest "in any of said real property" within the ten-year period he shall first offer it to the Tribe and that the requirement of such offer shall be a covenant to run with the land and shall be expressly provided in any patent issued before the expiration of that period. The regulations, 25 CFR § 243.2(g), define real property to mean "any interest in land set apart to the mixed-blood group and thereafter acquired by mixed-blood members under the terms of the Act, * * *." We believe that the intent of § 677n was to make the first-refusal right apply to both distributive shares and to purchased tribal land. The Secretary so construed it both in the regulation and in the patent issued to Elizabeth. In our opinion the administrative construction is correct and should be followed. See Red Lion Broadcasting Co., Inc. v. Federal Communications Commission, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371.
 
 
 28
 The reliance of Probst on laches is misplaced. The analogous, but inapplicable, Utah statute of limitations is three years. As we have heretofore pointed out, the events which gave the Tribe notice of the conveyance without the required offer occurred within three years before the suit was brought. In the circumstances, the burden is on the defendant to show extraordinary circumstances which require the application of the doctrine of laches. Shell v. Strong, 10 Cir., 151 F.2d 909, 911. Probst made no such showing.
 
 
 29
 The petitions for rehearing are severally denied.