**UNITED STATES of America, Plaintiff,**

v.

**Perry Von MURDOCK, Defendant.**

**No. 93–CR–308G.**

United States District Court,
D. Utah,
Central Division.

March 5, 1996.

---

---

Scott M. Matheson, Jr., United States Attorney, Stephen Roth and Matthew R. Howell, Assistant United States Attorneys, Salt Lake City, UT, for plaintiff.

Kent A. Higgins of Idaho Falls, Idaho, for defendant.

Robert S. Thompson, III, General Counsel for the Ute Indian Tribe, Boulder, CO, and John R. Lehmer, Local Counsel, Park City,

UT, for the Ute Indian Tribe of the Uintah and Ouray Reservation.

Edson Gardner, Legal Advocate, for the Aboriginal Uintah Nation.

Max D. Wheeler and Camille N. Johnson, Salt Lake City, for the Ute Distribution Corporation.

## MEMORANDUM DECISION AND ORDER

**J. THOMAS GREENE, District Judge.**

This case is before the court as a result of a pending Misdemeanor Information in which defendant Perry Von Murdock is charged with hunting on Indian land without lawful authority or permission in violation of 18 U.S.C. § 1165. The government has filed a Motion to Determine Defendant's Indian Status and defendant has filed a Motion to Dismiss and Motion to Bifurcate Issues. These motions have been extensively briefed by the parties,[1] as well as amicus curiae,[2] and after argument were taken under advisement.

### Background

In 1861, President Lincoln by Executive Order established over two million acres of land in northeastern Utah as the Uintah Valley Reservation for the use and occupation of the Uintah Band of the Ute Indians.[3] In the early 1880s, the Whiteriver Band of Ute Indians was relocated from Colorado to the same reservation, and the Uncompahgre Band of Ute Indians was established on adjacent lands. The reservations were combined in 1937 to form the Uintah and Ouray Indian Reservation. In that same year the three Bands joined together to form the Ute Indian Tribe[4] and adopted a Constitution. In 1954, pursuant to a policy of assimilating Indians into mainstream American society, the Ute Partition Act divided the Tribe into two groups: the "full-bloods" (those with one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half) and the "mixed-bloods" (those with insufficient Indian or Ute blood to qualify as "full-bloods" and those full-blood Utes who by choice became mixed-blood members).[5] Under the authority of that Act, also known as the Ute Termination Act, final membership rolls listing the full-blood and mixed-blood members of the Tribe were published in the Federal Register.[6] The Ute Termination Act provided that as of the date of publication of the final rolls (April 1956), *"the [Ute Indian] Tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided* [in the Act]," 25 U.S.C. § 677d (emphasis added). The Act further provided for removal of federal restrictions on the property of the "mixed-bloods," as well as termination of the federal trust relationship and services as to them:

> *Thereafter, such individual shall not be entitled to any of the services performed for Indians because of his status as an Indian. All statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to such member over which supervision*

**1.** The United States is represented by Scott M. Matheson, Jr., United States Attorney, Stephen Roth, Assistant United States Attorney, and Matthew R. Howell, Assistant United States Attorney; defendant is represented by Kent A. Higgins of Idaho Falls, Idaho.

**2.** The Ute Indian Tribe of the Uintah and Ouray Reservation, represented by Robert S. Thompson, III, General Counsel for the Ute Indian Tribe and John R. Lehmer, Local Counsel, submitted a brief in support of plaintiff United States of America. The Aboriginal Uintah Nation represented by Edson Gardner, Legal Advocate, filed a brief in support of defendant and the Motion to Dismiss. The Native Civil Rights Project, Dora Van, Executive Director, filed documents pertinent to the issues before the Court. The Ute Distribution Corporation, represented by

Max D. Wheeler and Camille N. Johnson, submitted a brief as an interested party in this litigation and as the authorized representative of the mixed-blood Ute Indians.

**3.** The Executive Order was confirmed by an Act of Congress in 1864—13 Stat. 63 (Act of May 5, 1864, Chapter 77).

**4.** This was done pursuant to authorization set forth in the Indian Reorganization Act, 48 Stat. 984, 987 (June 18, 1934—Section 16).

**5.** 25 U.S.C. § 677b and § 677c.

**6.** 21 Fed.Reg. 2208–12, April 5, 1956. The final rolls set forth the names of 490 mixed-blood Utes and 1314 full-blood Utes.

*has been terminated,* and the laws of the several States shall apply to such member in the same manner as they apply to other citizens within their jurisdiction.

25 U.S.C. § 677v (emphasis added). Because of the Ute Termination Act, the 490 mixed-bloods whose names were on the final roll of mixed-blood members of the Ute Indian Tribe are sometimes referred to as "Terminated Utes." The parents of defendant were listed on the final roll as among the mixed-blood terminated Utes.

The Tenth Circuit has noted that the Ute Termination Act was intended to assimilate the mixed-bloods by doing away with their wardship status. In *Ute Indian Tribe of the Uintah and Ouray Reservation v. Probst,* 428 F.2d 491, 498 (10th Cir.), cert. denied, 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970) the court stated that the Ute Termination Act "will permit the mixed-bloods to progress toward termination of Federal supervision without being held back by the full-bloods who desire continuation of wardship status." *Id.* at 498 (quoting House Report No. 2493, 83d Cong. 2d Sess., 2 U.S.Code Cong. & Admin.News 1954, at 3355–56).

On August 26, 1961, the Secretary published in the Federal Register a proclamation, entitled "Ute Indian Tribe of the Uintah and Ouray Reservation in Utah, Termination of Federal Supervision Over the Affairs of the Individual Mixed–Blood Members."[7] The Supreme Court has held that the Termination Proclamation fulfilled the purpose of the Ute Termination Act, "namely the termination of federal supervision over the trust and restricted property of the mixed-bloods," and upheld the Tenth Circuit's conclusion that thereafter "[n]o form of wardship or of federal trust relationship existed" between the United States and the mixed-blood Utes with respect to mixed-blood property. *Affili-*

*ated Ute Citizens of Utah v. United States,* 406 U.S. 128, 148–49, 156, 92 S.Ct. 1456, 1469–70, 1473, 31 L.Ed.2d 741 (1972) (citing *Reyos v. United States,* 431 F.2d 1337, 1340–43 (10th Cir.1970)). Accordingly, since the Termination Proclamation, the mixed-blood Utes have no longer had the status of federally-recognized Indians.

Notwithstanding their termination, the statute provides that the mixed-bloods retain an interest in, and the right to jointly manage with the Tribe, all assets of the Tribe that were "not susceptible to equitable and practicable distribution" at the time partition became effective.[8] Judge Jenkins of this court in *United States v. Felter,* 546 F.Supp. 1002, 1025 (D.Utah 1982), *affd.* 752 F.2d 1505 (10th Cir.1985), ruled that the right of mixed-bloods to hunt and fish on the Reservation "is incapable of practicable and equitable distribution under [25 U.S.C.] § 677i."

*Felter* at 1025.

In recognition that hunting and fishing rights on the reservation are not capable of practicable and equitable distribution and that such must be regulated, the Ute Indian Tribe and the mixed-bloods, acting through the Ute Distribution Corporation as representative,[9] each year thereafter jointly promulgated hunting and fishing regulations. In 1993–94, the following Proclamation was in effect when the alleged offense occurred:

> No tribal member, no terminated Ute, no non-member Indian, and no non-Indian ... may hunt any species of animal on trust lands or other lands within the exterior boundaries of the Uintah and Ouray Reservation unless said person has first obtained a valid permit to hunt said species from the Ute Tribe Fish and Wildlife Department, in accordance with the rules established in this Proclamation.[10]

---

7. 26 Fed.Reg. 8042 [hereinafter the Termination Proclamation].

8. 25 U.S.C. § 677i.

9. Pursuant to 25 U.S.C. § 677i, the mixed-bloods established the Ute Distribution Corporation as their authorized representative for purposes of jointly managing with the Tribe the indivisible assets. *See Murdock v. Ute Indian Tribe,* 975

F.2d 683 (10th Cir.1992), *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993).

10. Paragraph C5 of the Proclamation provides:
    Unless otherwise provided, those persons entitled to receive a permit to hunt on tribal land of the Uintah and Ouray Reservation shall consist exclusively of tribal members and terminated Utes who meet the requirements for issuance of a permit set out herein.

Defendant Perry Von Murdock was born on May 28, 1968, the son of two mixed-blood Utes, Colin Murdock and Laura Jane Hackford Murdock. Defendant's parents resided on the Uintah and Ouray Indian Reservation at the time of his birth. The names of defendant's parents were on the final mixed-blood role published in the Federal Register in 1956 pursuant to the Ute Partition and Termination Act 25 U.S.C. § 677a *et seq.,* as numbers 301 and 302 respectively. Murdock's parents became terminated mixed-blood Utes in 1961 as a result of the Termination Proclamation which ended their federal Indian status. At the time of defendant's birth, his parents were not members of the Ute Tribe.

Defendant Murdock never applied for membership in the Ute Tribe nor does his name appear on its membership role. In 1993, he applied for a permit to hunt big game on the Ute Reservation, but his application was rejected because he did not meet the requirements of the applicable hunting and fishing regulations.

### *Analysis*

The Misdemeanor Information pending against defendant charges:

On or about October 2, 1993, in the Central Division of the District of Utah and elsewhere, PERRY VON MURDOCK, the defendant herein, did knowingly and intentionally go upon *land belonging to the Ute Indian Tribe* and held in trust by the United States, for the *purpose of hunting and removing game therefrom* and did take an elk *without lawful authority or permission* in that he *did not have a permit* for taking such elk as required by the 1993/94 Ute Tribe Big Game Proclamation § B(1) and (2); all in violation of 18 U.S.C. § 1165. (Emphasis added.)

18 U.S.C. § 1165 provides as follows:

[w]hoever, *without lawful authority or permission,* willfully and knowingly goes upon *any land that belongs to any Indian or Indian tribe, band or group* and either are held by the United States in trust or are subject to a restriction against alien-

ation imposed by the United States, or upon any lands of the United States reserved for Indian use, for the *purpose of hunting, trapping, or fishing* thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited. (Emphasis added.)

The pending motions identify possible defenses—such as the alleged status of defendant as an Indian with inherent hunting and fishing rights—which could preclude prosecution of the defendant as a matter of law. There follows a discussion of those defenses.

### *Defendant's Right to be Informed of Charges*

██ Defendant claims in his motion to dismiss that the essence of the charge against him is trespass and that the only charge which is cognizable under 18 U.S.C. § 1165 is trespass upon Indian lands by non-Indians. The government responds that the charge on its face is not trespass and that the government is proceeding only on a theory of "no valid license." [11] It is clear from the face of the Misdemeanor Information that defendant is on notice that he is charged with hunting on Indian land without valid authorization or permission. Accordingly, this court holds that the Sixth Amendment of the United States Constitution is not implicated in that there has been no denial of plaintiff's right to be informed of the charges against him.

### *Jurisdiction*

██ Defendant argues that he is an Indian and that the purpose of 18 U.S.C. § 1165 is to prevent non-Indians from hunting on tribal lands, citing *United States v. Jackson,* 600 F.2d 1283 (9th Cir.1979). The government counters that *Jackson* only stands for the proposition that under 18 U.S.C. § 1165 federal courts will not take jurisdiction of *tribal members* who violate tribal hunting laws. In this regard, the government points out that in *United States v. Felter,* 546 F.Supp. 1002, 1026 (D.Utah 1982),

---

**11.** Government Reply Brief, p. 4, fn. 3.

aff'd, 752 F.2d 1505 (10th Cir.1985) Judge Jenkins found that *Jackson* did not apply to non-tribal members, stating:

> Though entitled to the fishing rights of a member of the tribe, Oranna B. Felter [the defendant] is no longer so enrolled, nor is she federally recognized as "Indian." Her situation is, therefore, distinguishable from that of the defendant in *United States v. Jackson,* 600 F.2d 1283 (9th Cir.1979), in which the United States Court of Appeals for the Ninth Circuit held that 18 U.S.C. § 1165 was not applicable to tribal members who hunted in violation of tribal regulations. Tribal jurisdiction over such minor offenses remains exclusive.... Indian tribes lack jurisdiction to try and punish non-Indians for criminal offenses, ... and 18 U.S.C. § 1165 was designed to fill that gap in enforcement powers as to non-Indians hunting or fishing on tribal or other Indian lands without tribal permission.... Because of The Termination Act, Oranna B. Felter would fall into the "non-Indian" category.

Defendant is charged with hunting on Ute tribal lands without a permit. He applied for such a permit and was refused because he did not qualify under the terms of aforesaid hunting and fishing regulations. As is discussed hereinafter, defendant has never been a member of the Ute Tribe, and his parents were not members of the Ute Tribe when he was born. This court holds that it has jurisdiction over hunting and fishing violations of the criminal law on reservation lands by non tribal member Indians as well as non Indi-

ans. In any event, this court has jurisdiction to determine whether jurisdiction exists where factual determinations, such as tribal membership, come into play. *See generally, Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 376, 60 S.Ct. 317, 319, 84 L.Ed. 329 (1940).

### Tribal Member Status of Defendant Under Requirements of Ute Indian Tribe

The Ute Termination Act provided that as of the date of publication of the final rolls (April 1956), "the [Ute Indian] tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided [in the Act]," 25 U.S.C. § 677d. The Ute Termination Act also provided that the Ute Indian Tribe shall have exclusive control over the requirements of membership in the Tribe:

> New membership in the tribe shall thereafter be controlled and determined by the constitution and bylaws of the tribe and the ordinances enacted thereunder. 25 U.S.C. § 677d.

It is clear from the record that defendant has never applied for membership in the Ute Tribe. Application for membership is an absolute requirement.[12]

In *Chapoose v. Clark,* 607 F.Supp. 1027 (D.Utah, 1985, Winder, J.), this court upheld the Tribe's right to determine its membership, including the right to reject claims of membership based upon birth alone.[13] The

---

12. *Tingey v. Ute Indian Tribe,* opinion of Ute Tribal Business Committee of the Ute Indian Tribe (November 1992).

13. In *Chapoose,* Judge Winder ruled that:
    After the division of full-bloods and mixed-bloods was complete, Congress intended that the Ute Tribe, now consisting of full-bloods only, be able to set its own membership requirements, just as it had done since 1937. The tribe was to set these membership requirements in its constitution, bylaws, and ordinances, just as it had done since 1937. 25 U.S.C. § 677d. Nowhere is there any indication that Congress intended to take away the Tribe's right to determine its own membership. Indeed, every indication, and there are many express indications, was that the Ute Tribe would continue to set its own membership

requirements. The only change was that the mixed-bloods were no longer tribal members for the purposes of sharing in trust fund distributions....
No person who received a share of tribal assets as a mixed-blood can now gain membership in the tribe under § 1(b) of article II of the tribal constitution. *Nor can the children of a terminated mixed-blood claim membership in the tribe through their mixed-blood parent.* The only way a child can gain membership in the tribe is by claiming membership through a parent who was a tribal member residing on the reservation when the child was born. Allowing a child in that category to have a right to tribal membership is fully consistent with the tribal members' desires to give their children a birthright. Moreover, it is entirely consistent with the intent of Congress to terminate

court in *Chapoose* further held that as a result of Ute Termination Act,

"[t]he mixed-bloods were to be given their share of tribal assets and then be assimilated into society. With some minor exceptions, they would no longer be treated as an Indian tribe. The full-bloods, on the other hand, were not to be terminated as a tribe. *The Ute Tribe would continue as a tribe, with only the full-bloods as members and not the mixed-bloods.*"

(*Id.* at 1032 (emphasis added)).

■ Defendant cannot claim tribal membership under the Ute tribal constitution in effect when he was born, which provided:

No person who received a share of tribal assets as a mixed-blood can now gain membership in the tribe under § 1(b) of article II of the tribal constitution. *Nor can the children of a terminated mixed-blood claim membership in the tribe through their mixed-blood parent.* (Article II, § 11 of the Tribal Constitution in effect when plaintiff was born.)

Although defendant's parents were original mixed-blood members on the roll, they were not tribal members after they were terminated in 1961. Defendant as a child of mixed-blood parents could not in any event claim tribal membership under the aforesaid tribal constitution.

The Tenth Circuit in *Gardner v. United States*, 25 F.3d 1056, 1994 WL 170780, (10th Cir. (Utah)), adopted and approved Judge Winder's conclusion that neither mixed-blood Terminated Utes nor their descendants under the Ute Tribal Constitution can be members of the Tribe:

Further, the Act provided that effective upon publication of the final rolls, "the tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in this subchapter. New membership in the tribe shall thereafter be controlled and determined by the

the mixed-bloods and to continue the tribe of full-bloods. The mixed-bloods have no more interest in the Tribe under this court's interpretation than any other non-Indian.
607 F.Supp. at 1034 (emphasis added).

constitution and bylaws of the tribe and ordinances enacted thereunder." § 677d. *This section was interpreted to mean that mixed-blood descendants can no longer become members of the tribe under its constitution. Chapoose v. Clark*, 607 F.Supp. 1027, 1036–37 (D.Utah 1985). Nor are mixed-blood descendants a federally recognized tribe of their own. *See* 58 Fed.Reg. 54,364 (1993). (Emphasis added).

This court holds that defendant has no status as a member of the Ute Indian Tribe under its Constitution and the requirements imposed by the Ute Tribe as to its membership.

### Alleged Rights of Defendant as a Member or Descendant of the Uintah Band

Defendant Murdock claims the right to hunt and fish on tribal lands because he is a member or a descendant of persons who belonged to the Uintah Band of Ute Indians.[14] The government concedes that defendant is such a descendant. The government further concedes that hunting and fishing rights were recognized or created by the Congressional Act of May 5, 1864 (13 Stat 63) as noted in *Felter*, 546 F.Supp. at 1011. The government also concedes that such rights were not abolished by the Ute Termination Act, and that they continue to exist as *personal rights in the terminated mixed-blood Utes* whose names were on the final rolls. The government contends, however, that such hunting and fishing rights do not exist in the descendants of terminated mixed-blood Utes.

Defendant urges this court to follow cases from the Ninth Circuit which had to do with treaty rights of withdrawn members of the Klamath Indian Tribe to hunt and fish on Indian lands, which rights were judicially recognized as "rights of the individual Indians." *Kimball v. Callahan*, 493 F.2d 564 (9th Cir.), *cert. denied*, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974) and *Kimball*

14. As previously noted, three separate Bands of Ute Indians in the past were established in the Uintah and Ouray Reservation: the Uintah Band, the Whiteriver Band and the Uncompahgre Band.

*v. Callahan* 590 F.2d 768 (9th Cir.) *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979), citing the Supreme Court case of *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 181, 93 S.Ct. 1257, 1267, 36 L.Ed.2d 129 (1973) in its interpretation of the Klamath Termination Act. These cases do not apply here, because we are here confronted with a different Termination Act—the Ute Termination Act—and rights which were transferred by the Ute Bands and established in the Ute Indian Tribe. Under the applicable proclamation concerning hunting and fishing rights, neither terminated mixed-blood Utes nor their descendants may hunt or fish on Tribal lands without a permit.[15]

■ Under generally recognized tribal law principles, communal rights and property do not descend to non communal children as heirs. In this regard, the Court of Claims stated in *Journeycake v. Cherokee Nation,* 28 Ct.Cl. 281, 302, 1800 WL 1921 (1893) *affirmed,* [155 U.S. 196, 15 S.Ct. 55, 39 L.Ed. 120 (1894) ]:

> The distinctive characteristic of [tribal] communal property is that every member of the community is an owner of it as such. He does not take it as heir, or purchased, or grantee; if he dies his right of property does not descend; if he removes from the community it expires; . . . and his children after him will enjoy all that he has enjoyed, not as heirs but as communal owners.

This principle is underscored in F. Cohen, Handbook of Federal Indian Law 185 (1942 ed.). The principle is extensively discussed in *Felter* wherein the Supreme Court decision of *Gritts v. Fisher,* 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912) is quoted and relied upon as part of the underpinning for Judge Jenkins' conclusion that the hunting and fishing privilege within the Ute reservation is a personal right of user, "neither inheritable nor transferable." [16]

Under the Ute Indian Tribe Constitution, all prior rights were to be exercised by the "people of the Uintah and Ouray Reservation." [17] By the time defendant was born, the Uintah Band of Ute Indians in effect had sold half of their pre-existing rights in and to "the use and occupancy of the (Uintah) Reservation," which included hunting and fishing rights, to the Whiteriver Band of Utes in settlement of claims.[18] In any event, by the

---

**15.** See fn. 10, *supra,* and discussion relating thereto.

**16.** Judge Jenkins in *Felter* went on to say:
This is wholly consistent with the letter and policy of the Ute Termination Act. The aggregate fish and game entitlement of the mixed-blood Utes will never exceed an approximate 27% share of the harvestable fish or game for the simple reason that the mixed-bloods represented no more than that percentage of the entitled group. Attrition will eventually extinguish the mixed-blood entitlement through the normal course of events. This is an equitable distribution of the rights involved. Ultimately the interests of the mixed-bloods in those rights will be ended. Recalling that the thrust of termination was to end federal *supervision* of Indian assets, not to extinguish the Indians' rights without just compensation, the continuing right of user concept accomplished that end without incurring inequities, administrative complications, or liability under the Fifth Amendment. . . . The continuing right of user concept . . . protects tribal authority over its own hunting and fishing rights and allows for uniform regulation of their exercise. Those who are entitled to such a right are readily identified from the published final mixed-blood roll.
*Felter* at 1021–25.

**17.** The Preamble of the Ute Indian Tribe Constitution adopted in 1937 recites that the Ute Indian Tribe was formed by Ute Indians of the Three Bands "in order to establish a more responsible tribal organization, promote the general welfare," etc. Article II defines membership of the Ute Indian Tribe, and Article VI, Section 4 provides:

> *Reserved powers.*—Any rights and powers heretofore vested in the Tribe or bands of the Uintah and Ouray Reservation but not expressly referred to in this Constitution shall not be abridged by this article, but may be exercised by the people of the Uintah and Ouray Reservation through the adoption of appropriate By-laws and constitutional amendments.

**18.** Finding in support of settlement. In *Uintah Ute Indians of Utah v. United States,* Indian Cl. Comm. Docket 45 (1957) the Indian Claims Commission held that the government was liable to the Uintah Utes for having deprived them of an undivided half of the lands of the Uintah Reservation because of the relocation onto the Reservation of the Whiteriver Band of Utes from Colorado. This and another claim against the United States was settled in 1960 by payment to the Uintahs of $7.7 million as settlement of claims, "and all matters involved in them." By reason of this settlement, the Uintah Band's prior

time defendant was born hunting and fishing rights had become vested in the Ute Indian Tribe to be exercised by tribal members and terminated mixed-blood Utes whose names were on the final roll. The transition from separate Bands into the Ute Indian Tribe was noted by the Tenth Circuit as having been accomplished in 1950:

> Pursuant to the I[ndian] R[eorganization] A[ct], the Uintah, White River, and Uncompahgre bands formed the Ute Indian Tribe of the Uintah and Ouray Reservation in 1937. . . .
>
> Thereafter, in June 1950, representatives of the members of the Uncompahgre, White River, and Uintah Bands signed a series of five tribal resolutions which completed the transition, which began with the constitution, from loosely-knit bands to unified Ute Tribe. *Hackford v. Babbitt,* 14 F.3d 1457, 1461 (10th Cir.1994).

The Tenth Circuit more recently has recognized that the Ute Termination Act not only removed governmental obligations and tribal status of terminated mixed-blood Ute Indians, but also of their descendants. In *Gardner v. United States,* 25 F.3d 1056, 1994 WL 170780 (10th Cir. (Utah)), the court stated:

> Section 677v [of the Ute Termination Act] does not expressly provide that federal supervision over descendants of terminated mixed-blood Utes is terminated. Our examination of the intent of the Act, as well as some of its other provisions, however, convinces us that this was the congressional intent.
>
> . . . *We can discern no reason why Congress would have intended that this policy [of termination] apply only to Indians who were living as of August 27, 1954, but not to their descendants.* (Emphasis added)

■ This court holds that defendant has no right to hunt and fish on tribal lands by reason of his membership in or as a descendant of members of the Uintah Band of Indians.

*Hunting and Fishing Rights of Terminated Mixed–Blood Utes May Not Be Inherited*

■ As a general principle of law concerning property rights of tribal members, such are personal rights which cannot be transferred or inherited:

> [T]he member's interest in the land is only derivative of membership. There is no jurisdiction to secure partition of the tribal estate. *The member's interest in the tribal property is personal and can be transferred or inherited only to the extent that tribal law allows use rights to be transferred. Heirs will participate in the tribal property in their own right only if they are members of the tribe.*[19] (Emphasis added)

In *United States v. Felter,* 752 F.2d 1505, 1512 (10th Cir.) the Tenth Circuit held that the Ute Termination Act did not abrogate tribal hunting and fishing rights of the mixed-blood Indians who were thereby terminated. However, Judge Jenkins described the personal nature of the right as follows:

> Individual mixed-blood Utes enrolled upon the final mixed-blood Roll (and still living) are thus entitled to hunting and fishing privileges within the Ute reservation equivalent to those afforded members of the tribe as now defined [i.e., full-blood Utes]. *As each of the mixed-blood Utes passes away, his or her personal right of user is extinguished, it being neither inheritable nor transferable.* (Emphasis added)

*United States v. Felter,* 546 F.Supp. at 1025. Judge Jenkins further underscored the non-inheritable rights of children of the terminated mixed-bloods:

> The children of persons listed on the mixed-blood roll would *not* enjoy the entitlement had by their parents. If they are to exercise any such tribal right that may occur only through direct affiliation with the tribe as members. F. Cohen, Hand-

---

exclusive rights to hunt and fish on the reservation were paid for, and the rights became nonexclusive.

**19.** Cohen, *Handbook of Federal Indian Law* 606.

book of Federal Indian Law 185 (1942 ed.). *Felter*, n. 52.

This court agrees.

What was dicta in that case is adopted as a holding in this case as to the defendant. This court considers that children of Terminated Utes including defendant herein do not inherit the right to hunt and fish on tribal lands from their parents who had personal rights to hunt and fish therein.

### Constitutionality of Ute Termination Act—In General

■ The authority of Congress to determine and define the relationship of the government with Indian Tribes and peoples exists as a part of the power to regulate commerce: "[S]uch regulation is rooted in the unique status of the Indians as a 'separate people' with their own political institutions." *United States v. Antelope*, 430 U.S. 641, 646, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (1977). The Ute Termination Act repeatedly has been held to be constitutional. *See, Affiliated Ute Citizens v. United States*, 406 U.S. 128, 143–145, 92 S.Ct. 1456, 1467–68, 31 L.Ed.2d 741 (1972) (the Ute Termination Act is within the power of Congress); *Ute Indian Tribe of the Uintah and Ouray Reservation v. Probst*, 428 F.2d 491, 498 (10th Cir.1970), *cert. denied*, 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970) (Ute Termination Act is not arbitrary or capricious discrimination in violation of the Fifth Amendment); *Chapoose v. Hodel*, 831 F.2d 931, 934 (10th Cir.1985) (following rationale of Probst).

The Ninth Circuit adopted the analysis of *Affiliated Utes* in *Poletti v. Internal Revenue Service*. That court rejected constitutional challenges to the Ute Termination Act, stating:

"Because the Supreme Court has found the UPA [Ute Partition and Termination Act] and the formation of the UDC [Ute Distribution Corporation] constitutional, Petitioner's additional arguments are unpersuasive...." The Supreme Court has held that "(a) UDC was lawfully created, (b) UDC is the authorized representative of the mixed-bloods under the partition act, (c) the termination proclamation ended all federal supervision and trust relationships with respect to the UDC shares." 34 F.3d 742, 748 n. 11 (9th Cir.1994) (citations omitted).

In *Affiliated Utes*, although the Supreme Court did not explicitly deal with the constitutionality of the Ute Termination Act, it is implicit in the Court's analysis that the Act is constitutional.[20]

### The Ute Termination Act does not Constitute Invidious Racial Discrimination

In furtherance of its plenary power, Congress has determined that tribal membership as well as termination of tribal membership may be determined by reference to Indian blood. In this regard, the court noted in *Simmons v. Eagle Seelatsee*, 244 F.Supp. 808, 813–14 (E.D.Wash.1965), that:

> *Congress in legislation has not hesitated to place full-blood Indians in one class and all others in another, giving one class more rights than the other.* (Emphasis added.)

The Ute Constitution uses a blood based method to determine tribal membership status. *See*, Ute Const. art. II § 1. The constitutionality of a blood based determination is supported by case law. *See Simmons v. Eagle Seelatsee*, 244 F.Supp. 808, 813–814 (E.D.Wash.1965) (blood based membership method for Yakima Indian Tribe did not violate U.S. Constitution). *See also, Tabbee v. United States*, 30 Fed.Cl. 1 (1993) (discussing the Ute Termination Act saying that rights based on parentage "[are] an inevit-

---

**20.** *Affiliated Utes* involved the illegal transfer of shares of stock under the securities laws issued to mixed-blood Utes. In that case the Supreme Court set forth an exhaustive analysis of the Ute Termination Act. The bona fide existence and actions of the Ute Distribution Corporation (the corporation set up by the mixed-bloods to manage their share of the undivided assets of the tribe) were challenged as illegal and unconstitutional. The Supreme Court said: "UDC's formation and structure were contemplated by the [Termination] Act, and the AUC itself created and breathed life and vigor into UDC. All this was within Congress' power." 406 U.S. at 144, 92 S.Ct. at 1467.

able effect of recognizing fundamental rights in tribal groups as well as individuals.").

### Termination of Federal Status as Indians does not Violate Due Process of Law

■ With respect to termination of tribal membership status as to the Ute Indian Tribe, the Tenth Circuit in *Ute Indian Tribe of the Uintah and Ouray Reservation v. Probst*, 428 F.2d 491, 498 (10th Cir.), *cert. denied*, 400 U.S. 926, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970), noted that the legislative history of the Ute Termination Act showed "that the mixed-bloods desired termination of federal supervision," while the full-blood Indians believed they were not ready for termination, and held that the Ute Termination Act did not violate the due process rights of mixed-blood Utes under the United States Constitution:

> In the case at bar the classification into the two groups was supported by the Indians, was relevant to the purposes of the legislation, and had a reasonable basis. *We find no arbitrary or capricious discrimination which violates Fifth Amendment due process.*

*Probst* at 498. (emphasis added). Similarly, in *Chapoose v. Hodel*, 831 F.2d 931, 934 (10th Cir.1987), the Tenth Circuit held that the Ute Termination Act does not violate the Fifth Amendment Due Process Clause of the Constitution.

Moreover, defendant was not alive at the time the Ute Termination Act was passed (1954) or when the Termination Proclamation was made (1961). Accordingly, defendant Murdock was not "terminated" since he was not a mixed-blood Ute whose name was on the final roll. Since he was yet unborn when the Ute Termination Act became law, he had no right to notice or a hearing thereunder. In all events, the Act provides constitutionally adequate due process protections, including circulation in a newspaper and an appeals process which has been utilized by several individuals to successfully appeal their status. Other suggested bases for challenge to the constitutionality of the Ute Termination Act are likewise rejected by this court.[21]

### Bifurcation

This court considers that it would be unworkable and an unnecessary duplication of judicial time and resources to bifurcate the various issues which have been raised and asserted as defenses by defendant. Accordingly, the Motion to Bifurcate should be denied.

Based upon the foregoing, it is hereby

ORDERED, that the government's Motion to Determine Status is GRANTED in accordance with the opinion set forth herein. The court will hear arguments of counsel as to whether any further evidentiary or other proceedings are necessary relative to this matter; it is

FURTHER ORDERED, that defendant's Motion to Dismiss is DENIED; it is

FURTHER ORDERED, that defendant's Motion to Bifurcate issues is DENIED.

The parties are to appear at a status conference on March 18, 1996 at 9:30 a.m. for a trial setting. The court understands that defendant has waived the applicability of the Speedy Trial Act and the computation of

---

21. It is urged that the Ute Termination Act violates freedom of the right of association, and constitutes interference with participation in the political process. However, there is no proscription in the Act against joining in any sort of intimate association. In this regard, the tribe does not meet the level of an intimate association under *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In any event, Murdock never applied for membership in the tribe and the Ute Tribe has the right to set its own membership requirements. Non-membership in a group that a person has never applied to join, is not a violation of her right to freely associate. There is no issue of political process since defendant chose to avail himself of the regulations applicable to hunting and fishing on reservation lands.

Murdock makes no claim of personal deprivation of freedom of religion but attempts to assert the rights of another. There is nothing in the record before the court that would indicate Murdock was constitutionally deprived of his religious freedom.

In suggesting that the Act constitutes a bill of attainder Murdock has not established any punitive intent nor is any said punitive intent evidenced by the enactment of the Ute Termination Act. Such is the prerequisite of *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 846–47, 104 S.Ct. 3348, 3351–52, 82 L.Ed.2d 632.

time thereunder. In any event, all time under the Speedy Trial Act is excluded from the date the motions were filed until such are finally determined.

IT IS SO ORDERED.